2004 OK 46

**STATE of Oklahoma ex rel. OKLAHOMA BAR ASSOCIATION, Complainant,**

v.

**James Mark DOBBS, Respondent.**

**Nos. OBAD 1496, SCBD 4634.**

Supreme Court of Oklahoma.

June 15, 2004.

Mike Speegle, Assistant General Counsel, Oklahoma Bar Association, Oklahoma City, OK, for Complainant.

Gary Rife, Rife & Walters, Oklahoma City, OK, for Respondent.

OPALA, V.C.J.

¶ 1 In this disciplinary proceeding against a lawyer, the issues to be decided are: (1) Does the record submitted for our examination provide sufficient evidence for a meaningful *de novo* consideration of the complaint and of its disposition? [1] and (2) Is a suspension from the practice of law for two years and one day an appropriate disciplinary sanction for respondent's breach of professional ethics? We answer both questions in the affirmative.

## I

### INTRODUCTION TO THE RECORD

¶ 2 The Oklahoma Bar Association (the Bar) commenced this disciplinary proceeding on 2 July 2001 against James Mark Dobbs (respondent or Dobbs), a licensed lawyer, by filing a formal complaint in accordance with the provisions of Rule 6.1 of the Rules Governing Disciplinary Proceedings ("RGDP").[2] The complaint alleges in sixteen counts multiple violations of the RGDP and of the Oklahoma Rules of Professional Conduct ("ORPC").[3]

1. The record consists of a transcript of the hearing held before a trial panel of the Professional Responsibility Tribunal, exhibits offered by both parties, which were admitted into evidence at the hearing, respondent's Proposed Findings and Stipulations, complainant's Proposed Findings of Fact and Conclusions of Law, respondent's Supplemental Proposed Findings, Conclusions and Authority for Proposed Discipline, and the trial panel's report.

2. The Rules Governing Disciplinary Proceedings are codified at 5 O.S.2001, Ch.1, App. 1–A. The provisions of RGDP Rule 6.1 state:

"The proceeding shall be initiated by a formal complaint prepared by the General Counsel, approved by the Commission, signed by the chairman or vice-chairman of the Commission, and filed with the Chief Justice of the Supreme Court."

3. The Oklahoma Rules of Professional Conduct are codified at 5 O.S.2001, Ch. 1, App. 3–A.

¶3 Beginning on 10 October 2002 and continuing on seven non-consecutive days through 16 November 2002,[4] a trial panel of the Professional Responsibility Tribunal (the trial panel) conducted a hearing (the PRT hearing) to consider the charges. The parties submitted no stipulations.[5] Respondent denies most of the allegations.

¶4 Upon completion of the hearing and after consideration of the testimony and exhibits on file, the trial panel issued a report which found that respondent violated numerous provisions of the rules of professional conduct. The panel recommended that respondent be suspended from the practice of law for thirty (30) months and that he be directed to pay the costs of this proceeding.

## II

## THE RECORD BEFORE THE COURT PROVIDES SUFFICIENT EVIDENCE FOR A MEANINGFUL *DE NOVO* CONSIDERATION OF ALL FACTS RELEVANT TO THIS PROCEEDING

¶5 In a bar disciplinary proceeding the court functions as an adjudicative licensing authority that exercises exclusive original cognizance.[6] Its jurisdiction rests on the court's constitutionally vested, nondelegable power to regulate the practice of law, including the licensure, ethics, and discipline of this state's legal practitioners.[7] In deciding whether discipline is warranted and what sanction, if any, is to be imposed for the misconduct charged, the court conducts a full-scale, nondeferential, *de novo* examination of all relevant facts,[8] in which the conclusions and recommendations of the trial panel are neither binding nor persuasive.[9] In this undertaking we are not restricted by the scope-of-review rules that govern corrective relief on appeal or on certiorari, proceedings in which another tribunal's findings of fact may have to be left undisturbed by adherence to law-imposed standards of deference.[10]

¶6 The court's duty can be discharged only if the trial panel submits to us a complete record of the proceedings.[11] Our

---

4. In addition to 10 October 2002, the trial panel heard evidence on 11 October, 14 October, 21 October, 7 November, 8 November, 12 November, and 16 November.

5. A stipulation of fact is an agreement between the parties that establishes an identified fact or facts in controversy. It serves as an evidentiary substitute dispensing with the need for legal proof of the agreed fact or facts. *State ex rel. Okla. Bar Ass'n v. Giger*, 2001 OK 96, ¶8, 37 P.3d 856, 861. Respondent submitted paperwork entitled Proposed Findings and Stipulations, but no stipulations were tendered.

6. *State ex rel. Okla. Bar Ass'n v. Leigh*, 1996 OK 37, ¶11, 914 P.2d 661, 666; *State ex rel. Okla. Bar Ass'n v. Eakin*, 1995 OK 106, ¶8, 914 P.2d 644, 647; *State ex rel. Okla. Bar Ass'n v. Bolton*, 1994 OK 53, ¶15, 880 P.2d 339, 344; *State ex rel. Okla. Bar Ass'n v. Donnelly*, 1992 OK 164, ¶11, 848 P.2d 543, 545; *State ex rel. Okla. Bar Ass'n v. Raskin*, 1982 OK 39, ¶11, 642 P.2d 262, 265; *In re Integration of State Bar of Oklahoma*, 1939 OK 378, 95 P.2d 113, 115.

7. *Eakin, supra* note 6 at ¶8, at 648; *State ex rel. Okla. Bar Ass'n v. Downing*, 1990 OK 102, ¶12, 804 P.2d 1120, 1122–1123; *Raskin, supra* note 6 at ¶11, at 265–266.

8. *Leigh, supra* note 6; *Eakin, supra* note 6 at ¶8, at 647–648; *State ex rel. Okla. Bar Ass'n v. Lloyd*, 1990 OK 14, ¶8, 787 P.2d 855, 858; *State ex rel. Okla. Bar Ass'n v. Stubblefield*, 1988 OK 141, ¶7, 766 P.2d 979, 982; *State ex rel. Okla. Bar Ass'n v.*

*Cantrell*, 1987 OK 17, ¶1, 734 P.2d 1292, 1293; *State ex rel. Okla. Bar Ass'n v. Brandon*, 1969 OK 28, ¶5, 450 P.2d 824, 827. Because this court's cognizance of disciplinary proceedings cannot be shared with any other institution, every aspect of the Bar's adjudicative process must be revisited by our *de novo* consideration. The attribute of nondelegable jurisdiction serves to distinguish the conduct of bar disciplinary functions from trial *de novo*—a retrial in a different court—or even from *de novo* appellate review on the record, which stands for an independent, non-deferential examination *of another tribunal's record.*

9. *Eakin, supra* note 6 at ¶8, at 648; *Raskin, supra* note 6 at ¶11, at 265. The court's range of options in a disciplinary proceeding is set forth in RGDP Rule 6.15(a), 5 O.S.2001, Ch.1, App. 1–A, which states in pertinent part:
 "The Supreme Court may approve the Trial Panel's findings of fact or make its own independent findings, impose discipline, dismiss the proceedings or take such other action as it deems appropriate."

10. *Bolton, supra* note 6 at ¶15, at 344; *Eakin, supra* note 6 at ¶8, at 648; *State ex rel. Okla. Bar Ass'n v. Farrant*, 1994 OK 13, ¶7, 867 P.2d 1279, 1284; *Levi v. Mississippi State Bar*, 436 So.2d 781, 782 (Miss.1983).

11. The provisions of RGDP Rule 6.13, 5 O.S. 2001, Ch. 1, App.1–A, state in pertinent part:
 "Within thirty (30) days after the conclusion of the hearing, the Trial Panel shall file with the

initial task is to ascertain whether the tendered record is sufficient to permit (a) this court's independent determination of the facts and (b) its crafting of an appropriate discipline. The latter is that which (1) is consistent with the discipline imposed upon other lawyers who have committed similar acts of professional misconduct and (2) avoids the vice of visiting disparate treatment on the offending lawyer.[12]

¶ 7 Having carefully scrutinized the record submitted to us in this proceeding, we conclude that it is adequate for *de novo* consideration of respondent's alleged professional misconduct.

### III

### COUNTS 1-11: THE CARGILE MATTER

¶ 8 Respondent graduated from law school in 1990 and returned to Eufaula, his hometown, to set up practice. Shortly after he arrived, he was told by Joe Johnson, the mayor of Eufaula and a long-time friend, that an elderly Tulsa woman named Lucille Cargile (Mrs. Cargile) owned some vacant lots (the Cargile lots or the lots) in Eufaula and might be interested in selling them. The Bar contends that Johnson not only told respondent about the lots, but actually made an agreement with him at that time for their purchase of the lots together as partners. Respondent denies this. Whether for himself alone or on behalf of himself and John-

son, respondent telephoned Mrs. Cargile and made an offer to purchase the lots. Mrs. Cargile accepted.

¶ 9 Respondent soon discovered that title to the lots was not in Mrs. Cargile's name, but in the name of her deceased brother, Clarence Brand (Brand). Respondent telephoned Mrs. Cargile to inquire again into the property's ownership. Respondent testified that Mrs. Cargile insisted she was her brother's only heir and that the lots belonged solely to her. Respondent admitted at the PRT hearing that he did not ascertain whether Mrs. Cargile understood the meaning of the word "heir" and he did not explain its meaning to her. Still, he has consistently testified that he asked her specifically if she and her brother had any other siblings or if her brother had any children and she assured him there were no other siblings and no children.

¶ 10 On 7 January 1991 respondent brought a quiet title action on behalf of Mrs. Cargile in the District Court, McIntosh County.[13] This was the first action respondent ever filed as a lawyer. His attempt to identify and locate heirs was confined to an examination of the county clerk's records pertaining to the lots he was purchasing. Not finding any indication of other heirs in those records, he served notice of the action by publication, signing the supporting "due diligence" affidavit himself (the "first affidavit").[14]

---

Clerk of the Supreme Court a written report which shall contain the Trial Panel's findings of fact on all pertinent issues and conclusions of law (including a recommendation as to discipline, if such is found to be indicated, and a recommendation as to whether the costs of the investigation, record and proceedings should be imposed on the respondent), and shall be accompanied by all pleadings, a transcript of the proceeding, and all exhibits offered thereat...."

12. *Eakin, supra* note 6 at ¶ 9, at 648; *Bolton, supra* note 6 at ¶ 16, at 345; *State ex rel. Okla. Bar Ass'n v. Perceful*, 1990 OK 72, ¶ 5, 796 P.2d 627, 630.

13. Dobbs was asked by the lawyer member of the panel whether he had obtained Mrs. Cargile's permission to represent her in the quiet title action. Dobbs responded that he told her he had to quiet the title. (PRT Hearing Transcript, v.3: 683). He admitted that he probably did not

explain to her what that meant. (PRT Hearing Transcript, v. 3: 850).

14. Notice conformable to the standards of due process is a *sine qua non* element of judicial cognizance. *In Re Application of the Oklahoma Boll Weevil Eradication Organization for Approval of $5 Million Oklahoma Boll Weevil Eradication Organization Assessment Note, Series 1998*, 1999 OK 1, ¶ 4, 976 P.2d 1035, 1038 (Opala, J., dissenting); *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313–15, 70 S.Ct. 652, 656–57, 94 L.Ed. 865 (1950). In *Bomford v. Socony Mobil Oil Co., Inc.*, 1968 OK 43, 440 P.2d 713, the court said that before a litigant may resort to publication notice he or she must make a diligent search of all available resources to determine the adversary's whereabouts. The court indicated that due diligence requires at least a search of local tax rolls, deed records, judicial and other official records, telephone directories, city directories and the like. *Id.* at

¶ 11 The quiet title action was heard on or about 4 March 1991. No one other than Mrs. Cargile appeared claiming to be an heir. The court found that publication notice was authorized and ordered title to the lots quieted in Mrs. Cargile. The next day, respondent mailed a copy of the journal entry to Mrs. Cargile along with his payment for the lots and a blank warranty deed for her to execute. Mrs. Cargile signed the deed, had it acknowledged, and mailed it back to respondent. For unexplained reasons, respondent did not file the deed of record until 30 January 1992.

¶ 12 In late 1992 or early 1993, Brenda Otis, a city employee who worked with Mayor Johnson, stopped by respondent's office and told him she was interested in purchasing the Cargile lots.[15] In anticipation of a sale, respondent asked another Eufaula attorney, Fred Wendel ("Wendel"), to examine the title. Wendel did so and discovered a defect in the quiet title paperwork which would have to be cured before the property could be sold. Wendel suggested that respondent have the original quiet title judgment set aside, file an amended petition, and obtain a new judgment.

¶ 13 Accordingly, respondent prepared the necessary paperwork to refile the action and moved the district court to set aside the original quiet title judgment. Intending once again to serve notice by publication, respondent or a member of his office staff telephoned Mrs. Cargile and asked her if she would sign the supporting affidavit. She agreed and respondent mailed one to her. Several days later, the signed affidavit was returned to respondent's office (the "second affidavit"). Respondent's secretary, Shawn Bass Nelson, testified that she opened the envelope and saw the affidavit. It was not notarized. Respondent admits he directed Nelson, a notary public, to notarize the second affidavit even though she did not personally observe Mrs. Cargile sign it.

¶ 14 After Nelson notarized the second affidavit, Dobbs showed it to Wendel who was not satisfied with it. Wendel advised respondent to prepare another affidavit that would contain specific language that Wendel considered critical. The second affidavit was never filed. Respondent testified to the trial panel that he prepared a new affidavit and telephoned Mrs. Cargile again to ask her if she would sign it. He testified that Mrs. Cargile declined because of poor health, but gave him permission to sign her name to the affidavit. He did so and then notarized his own rendering of her signature (the "third affidavit"). The original judgment quieting title in Mrs. Cargile was set aside on 9 February 1993 and respondent filed the amended petition. He then filed the third affidavit in the quiet title action on 19 February 1993.

¶ 15 Shortly thereafter, Dobbs learned that Mrs. Cargile might not be the only living heir of her brother. Upon investigation, Dobbs discovered that there were indeed other living heirs (the Brand heirs). Dobbs testified that Wendel suggested he contact the Brand heirs and ask them if they would be willing to quitclaim their interest in the lots to him. He called on one of the potential heirs, Pat Cepowski, and discussed this option with her. Respondent testified that he left with the impression that she would execute a quitclaim deed to him and that she would obtain quitclaim deeds for him from the other Brand heirs. Respondent testified that at the time he still believed that Mrs. Cargile was the sole owner of the lots and that the Brand heirs did not actually have any interest in them.[16]

---

¶ 14, at 718. The particular probative facts showing due diligence must be presented to the court before judgment is rendered. *Id.* at ¶ 20, at 720. These facts may be set forth in an affidavit or in a verified pleading or they may be adduced by proof presented at the hearing to be conducted before entry of judgment. *Id. See also* the provisions of Rule 16, Rules For District Courts of Oklahoma, 12 O.S.2001, Ch. 2, App. 1, which establish standards for the judicial inquiry that must be made into whether a plaintiff made a diligent and meaningful search of all reasonably available sources at hand when notice is served solely by publication.

15. While it was not clear whether Ms. Otis wanted to purchase one lot or all three lots, there was some testimony that the lots were very small and a purchaser would need to acquire all three lots for a house site.

16. Respondent's continuing belief that Mrs. Cargile was Clarence Brand's sole heir even after learning that the deceased had other relatives

¶ 16 Instead, Cepowski and the other Brand heirs hired an attorney, Rocky Boydston (Boydston), who filed an answer to the amended quiet title petition asserting the interests of the Brand heirs in the property and pressing a counterclaim against Mrs. Cargile and unnamed others for damages for abuse of legal process. Dobbs was soon added as a party defendant to the counterclaim. The next day he asked the district court for permission to withdraw as Mrs. Cargile's attorney. Four days later, the Brand heirs dismissed Dobbs with prejudice from the action in exchange for his agreement to disclaim any further interest in the Cargile lots and to convey to them any interest he may have acquired in the lots from Mrs. Cargile. He did not ask for, nor did he ever receive, the return of the consideration he had paid for the lots.

¶ 17 Although dismissed from the litigation, Dobbs was deposed by Boydston on 22 June 1993 (the "Cargile deposition"). Dobbs admits that during the Cargile deposition he denied under oath that he signed Mrs. Cargile's name to the third affidavit. Boydston soon learned that respondent had testified falsely, but agreed not to pursue the matter with the Bar if Dobbs would assure him that he would behave ethically in the future.

### Count 1

¶ 18 The Bar alleges in Count 1 of the Complaint that respondent provided incompetent representation to Mrs. Cargile in the quiet title action in violation of ORPC Rule 1.1. That rule states:

"A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation."

Respondent argues that this rule does not apply because it deals only with the competence of legal services provided *to a client.* Respondent contends that Mrs. Cargile was not his client in the quiet title action, but only a nominal party to the action. Because he had a contract to purchase the property from her, he contends that *he* was the real party in interest. We disagree.

¶ 19 When a lawyer purports to be a person's attorney and takes legal action in that person's name and on her behalf, he cannot later claim that he is not that person's attorney just because he also has an interest in the outcome of the representation. Respondent undertook to minister to Mrs. Cargile as a legal practitioner and held himself out to the public as her attorney. He used her name as the plaintiff in the quiet title action, the petition's allegations recited facts relating to Mrs. Cargile's interest in the property, he signed and filed an affidavit in the action stating that he was Mrs. Cargile's attorney, he represented to the court in his motion to withdraw that he was her attorney, and he asserted the attorney-client privilege on behalf of Mrs. Cargile when he was deposed by Boydston. Respondent's conduct created an attorney-client relationship for purposes of professional discipline.

¶ 20 A lawyer's license is a certificate of professional fitness to deal with the public as a legal practitioner.[17] Professional competence is a mandatory obligation imposed upon licensed practitioners. It is the very minimum to be expected from a lawyer. It epitomizes professionalism. Anything less is a breach of a lawyer's duty to serve the client.[18] Respondent failed to demonstrate competence in his handling of the quiet title action. His services to Mrs. Cargile were substandard even for a new practitioner. His lack of competence resulted in injury to his client, an elderly woman who was sued by her relatives in connection with the matter respondent was handling for her. We find clear and convincing evidence that respondent failed to provide Mrs. Cargile with competent representation in violation of ORPC Rule 1.1. We also find that respondent vio-

appears to have been the result of respondent's uncritical reliance on Mrs. Cargile's claim that she alone owned the lots and not on the application of any legal principles that govern inheritance.

17. *State ex rel. Okla. Bar Ass'n v. Evans,* 1994 OK 45, ¶ 17, 880 P.2d 333, 339.

18. *Id.* at ¶ 16, at 338–39; *State ex rel. Okla. Bar Ass'n v. Johnston,* 1993 OK 91, ¶ 28, 863 P.2d 1136, 1145.

lated RGDP Rule 1.3,[19] which authorizes discipline for acts contrary to prescribed standards of conduct that might reasonably be found to bring discredit upon the legal profession. Respondent's failure to act with reasonable competence in representing Mrs. Cargile constituted a marked departure from the standards of competence imposed by ORPC Rule 1.1 and is grounds for discipline under RGDP Rule 1.3.[20]

¶ 21 The Bar also alleges in Count 1 of the Complaint that respondent lied under oath in the Cargile deposition when he denied signing Mrs. Cargile's name to the third affidavit. Respondent admits that he gave this testimony, that it was false, and that it constitutes a violation of ORPC Rule 8.4(c).[21] Respondent's admission is supported by clear and convincing evidence. His conduct constitutes a violation of ORPC Rule 8.4(c).[22] It also violates RGDP Rule 1.3.

¶ 22 The Bar alleges that respondent's false testimony about signing the third affidavit constitutes perjury and hence also violates ORPC Rule 8.4(b).[23] Before we turn to the merits of this charge, we must first decide whether perjury may serve as the basis for professional discipline or whether the doctrine that witnesses are ordinarily immune from civil damages for testimony given in judicial proceedings should be extended to immunize lawyer-witnesses from professional discipline based on their testimony. Although respondent did not raise this issue, we do so *sua sponte* because the matter presents a public-law issue and bears upon the court's subject-matter cognizance of this proceeding for imposition of bar discipline.

¶ 23 Oklahoma has long recognized that attorneys, parties and witnesses are immune from *defamation and certain other suits* where those suits are based upon communications made *during or preliminary to judicial proceedings* as long as the communication is in some way relevant to the proceeding.[24] In 1995 in *Cooper v. Parker–*

19. The provisions of RGDP Rule 1.3, 5 O.S.2001, Ch. 1, App. 1–A, state:

> The commission by any lawyer of any act contrary to prescribed standards of conduct, whether in the course of his professional capacity, or otherwise, which act would reasonably be found to bring discredit upon the legal profession, shall be grounds for disciplinary action, whether or not the act is a felony or misdemeanor, or a crime at all. Conviction in a criminal proceeding is not a condition precedent to the imposition of discipline.

20. *State ex rel. Okla. Bar Ass'n v. McGee*, 2002 OK 32, ¶ 8, 48 P.3d 787, 790.

21. The provisions of ORPC Rule 8.4(c), 5 O.S. 2001, Ch.1, App. 3–A, state:

> "It is professional misconduct for a lawyer to:
> * * *
> (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation; ..."

22. For a misrepresentation to constitute a violation of ORPC Rule 8.4(c) it must be shown by clear and convincing evidence that the declarant had an improper motive for making the statement. *State ex rel. Okla. Bar Ass'n v. Taylor*, 2003 OK 56, ¶ 17, 71 P.3d 18, 27. The Bar has alleged that respondent repeatedly violated ORPC Rule 8.4(c) in a variety of circumstances. In each instance throughout this opinion in which we have determined that respondent violated that rule, we have carefully examined the record and ascertained that adequate proof of an improper motive for respondent's misconduct is present.

23. The provisions of ORPC Rule 8.4(b), 5 O.S. 2001, Ch.1, App. 3–A, state:

> "It is professional misconduct for a lawyer to:
> . . .
> * * *
> (b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects; ..."

24. *Hammett v. Hunter*, 1941 OK 253, 117 P.2d 511, 511 (stating in the court's syllabus: "1. Defamatory words published by the parties, counsel or witnesses, in due course of a judicial proceeding and which are connected with, or relevant or material to, the cause in hand or subject of inquiry, constitute an absolutely privileged communication, and no action will lie therefor, however false or malicious they may in fact be."); *Kirschstein v. Haynes*, 1990 OK 8, 788 P.2d 941 (holding that (1) the immunity doctrine applies not only to defamation suits, but also to suits for intentional infliction of emotional distress arising from the same circumstances as the defamation claim and that (2) the doctrine encompasses communications made preliminary to judicial or quasi-judicial proceedings). *See also Pacific Employers Ins. Co. v. Adams*, 1946 OK 86, 168 P.2d 105 (holding that statements made in a physician's report attached to pleading filed with State Industrial Court are immune); *Hughes v. Bizzell*, 1941 OK 277, 117 P.2d 763 (holding that statements made at a hearing before University Board of Regents to determine if discharge of

*Hughey*[25] we extended the immunity rule to *tort actions for perjury.*[26] We identified the following public policy reasons for rejecting the tort of perjury: (1) absolute immunity for witnesses in a judicial proceeding encourages witnesses to speak freely without fear of civil liability; (2) perjury is a public offense and regulated solely by the criminal law; (3) the need for finality in judgments, (4) the possibility of a multiplicity of suits by parties dissatisfied with the outcome of trials, and (5) lack of precedent for such actions.[27]

¶ 24 We have never before directly addressed whether the immunity doctrine bars the imposition of professional discipline for perjury, but in *Kirschstein v. Haynes,*[28] we noted that the privilege does not protect an attorney from professional discipline based on unethical conduct constituting defamation.[29] A number of states and the federal government have imposed professional discipline on attorneys for perjury and other litigation-related misconduct without expressing concern for the immunity doctrine.[30] Others have indicated in dicta that an attorney remains subject to professional discipline for litigation-related misconduct even where the immunity rule prevents redress by civil ac-

employee should be upheld are immune); *Sanford v. Howard*, 1939 OK 343, 95 P.2d 644 (holding that statements made during session of University Board of Regents concerning purported immoral conduct of employee are immune); *Dickerson v. Crozier*, 1927 OK 401, 261 P. 545 (holding that statements made in complaint filed with city police court are immune).The immunity of parties and witnesses from liability in damages for their testimony in judicial proceedings was established early in English common law. *See Briscoe v. LaHue*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983), in which the Court cites *Cutler v. Dixon*, 76 Eng. Rep. 886 (K.B.1585) and *Anfield v. Feverhill*, 80 Eng. Rep. 1113 (K.B. 1614) as early English authority for the immunity doctrine.

**25.** 1995 OK 35, 894 P.2d 1096.

**26.** *Id.* at ¶ 27, at 1101. The court in *Cooper* relied heavily on the reasoning expressed in *Briscoe v. LaHue, supra* note 24, a 1983 United States Supreme Court decision in which convicted defendants brought a civil rights action against police officers who testified against them, alleging that the officers violated the defendants' constitutional rights to due process and a fair trial by falsely testifying that the criminal defendants had been able to harmonize their stories, thereby rendering the exculpatory statements of each criminal defendant less credible. Holding that the officers were immune from liability for any damages resulting from their testimony, the Court in *Briscoe* provided the following summary of the reasons for the immunity rule:

"[I]n damages suits against witnesses, 'the claims of the individual must yield to the dictates of public policy, which requires that the paths which lead to the ascertainment of truth should be left as free and unobstructed as possible.' [citation omitted] A witness's apprehension of subsequent damages liability might induce two forms of self-censorship. First, witnesses might be reluctant to come forward to testify. [citation omitted] And once a witness is on the stand, his testimony might be distorted by the fear of subsequent liability. [citation omitted] Even within the constraints of the witness's oath there may be various ways to give an account or to state an opinion. These alternatives may be more or less detailed and may differ in emphasis and certainty. A witness who knows that he might be forced to defend a subsequent lawsuit, and perhaps to pay damages, might be inclined to shade his testimony in favor of the potential plaintiff, to magnify uncertainties, and thus to deprive the finder of fact of candid, objective, and undistorted evidence. [citation omitted] But the truth-finding process is better served if the witness's testimony is submitted to 'the crucible of the judicial process so that the fact finder may consider it, after cross-examination, together with the other evidence in the case to determine where the truth lies.' [citation omitted]" *Id.* at 332–33, 103 S.Ct. at 1114–15.

**27.** *Cooper v. Parker–Hughey, supra* note 25 at ¶ 26, at 1101.

**28.** *Supra* note 24.

**29.** *Id.* at ¶ 19, at 951(stating that while the public policy served by the privilege immunizes defamers from a damage action, it does not protect against other forms of censure or sanctions). *See also Selby v. Burgess*, 289 Ark. 491, 712 S.W.2d 898, 900 (1986) (privilege does not immunize attorney from professional discipline).

**30.** *See e.g. Imbler v. Pachtman*, 424 U.S. 409, 428–29, 96 S.Ct. 984, 994, 47 L.Ed.2d 128 (1976) (noting that prosecutorial immunity from liability in civil suits brought under 42 U.S.C.A. § 1983 does not leave the public without recourse to censure prosecutorial misconduct because prosecutors remain subject to professional discipline.). *See also Attorney Grievance Commission v. White*, 354 Md. 346, 731 A.2d 447 (1999); *Barreiro v. State Bar*, 2 Cal.3d 912, 88 Cal.Rptr. 192, 471 P.2d 992 (1970); *Montag v. State Bar*, 32 Cal.3d 721, 186 Cal.Rptr. 894, 652 P.2d 1370 (1982); *Montgomery County Bar Association v. Hecht*, 456 Pa. 13, 317 A.2d 597 (1974); *Matter of Barratt*, 663 N.E.2d 536 (Ind.1996);.

tion.[31]

¶ 25 The immunity rule's applicability to a professional disciplinary proceeding was directly addressed in *Deatherage v. Examining Board of Psychology*.[32] In that case the Supreme Court of Washington held that witness immunity cannot be raised as a defense to a state licensing board's initiation of a medical disciplinary proceeding against a psychologist who was accused of negligently rendering his professional opinion in child custody cases.[33] The court in that case reasoned that there are important distinctions between a civil suit and a disciplinary proceeding and that the public-policy rationale for the immunity doctrine would not be undermined by imposing professional discipline in cases where a civil suit would be barred. We agree with the reasoning expressed in that case and hold that the witness immunity doctrine does not preclude imposition of professional discipline for a lawyer's perjury.

¶ 26 Although the Bar does not direct us to the applicable Oklahoma perjury statute, it is clear from the Complaint and from the evidence adduced at the PRT hearing that the charge of professional misconduct set out in Count 1 of the Complaint is based on perjury as defined in 21 O.S.2001 § 491.[34] That section states:

"Whoever, in a trial, hearing, investigation, deposition, certification or declaration, in which the making or subscribing of a statement is required or authorized by law, makes or subscribes a statement under oath, affirmation or other legally binding assertion that the statement is true, when in fact the witness or declarant does not believe that the statement is true or knows that it is not true or intends thereby to avoid or obstruct the ascertainment of the truth, is guilty of perjury. It shall be a defense to the charge of perjury as defined in this section that the statement is true."

¶ 27 Respondent argues that the Bar failed to prove by clear and convincing evidence that he had the state of mind necessary to support a finding that he committed perjury.

¶ 28 The provisions of § 491 authorize a conviction for perjury if any one of three states of mind is proved: if the witness or declarant (1) does not believe the statement is true, (2) knows that the statement is untrue, or (3) intends by the statement to thwart the ascertainment of the truth. Respondent admitted to the trial panel that he knew his denial that he signed the third affidavit was untrue. That admission would be sufficient to prove the element of intent in a criminal prosecution for perjury [35] and it is sufficient to warrant professional discipline

---

**31.** *See Stucchio v. Tincher*, 726 So.2d 372, 374 (Fla.App.1999) (noting that "[r]emedies for perjury, slander, and the like committed during judicial proceedings are left to the discipline of the courts, the bar association, and the state"); *Selby v. Burgess*, *supra* note 29 at 900 (holding that while the privilege protects an attorney from litigation it will not make him immune from professional discipline); *Theiss v. Scherer*, 17 Ohio Misc. 172, 396 F.2d 646, 649 (6th Cir. 1968); *Ruberton v. Gabage*, 280 N.J.Super. 125, 654 A.2d 1002, 1007 (1995) (emphasizing that the absolute privilege applies only to claims of tortious conduct and not to a claim of unprofessional conduct or to summary contempt proceedings against the offending attorney).

**32.** 134 Wash.2d 131, 948 P.2d 828 (1997).

**33.** *Id.* at 833.

**34.** No rule exists which requires the Bar to identify the public offense that forms the basis of an allegation that a lawyer has violated ORPC Rule 8.4(b), but it would be better practice for the Bar

to provide us with that information. Conduct is criminal only if so defined by statute and, as we note later in this opinion, the essential elements of a crime are determined solely from the statutory provision defining the offense. We cannot find a violation of ORPC Rule 8.4(b) unless we are apprized of the elements constituting the underlying criminal offense. We must be able to examine the record to determine whether the Bar has successfully proved each of those elements. The court will not search the criminal code and other statutes of the State for a provision criminalizing the conduct the Bar alleges violates ORPC Rule 8.4(b). If, as in this count of the complaint, the statutory provision defining the offense is readily apparent, we will proceed to determine whether a violation of professional ethics has occurred even if the Bar does not provide us with a citation to the applicable statute. Where the underlying criminal offense is not readily apparent, the Bar's failure to direct us to the applicable criminal statute may result in the respondent's exoneration.

**35.** *Marshall v. State*, 1976 OK CR 139, 551 P.2d 291.

under Rule 8.4(b). We reject respondent's contention his fear of the attorney conducting the deposition and his belief he was being accused of forgery altered his state of mind to one other than that required by the perjury statute.[36] We find by clear and convincing evidence that respondent violated ORPC Rule 8.4(b) by committing perjury in the Cargile deposition when he denied he signed Mrs. Cargile's name to the third affidavit.

¶ 29 The Bar next alleges in Count 1 of the Complaint that respondent violated ORPC Rule 8.4(b) and 8.4(c) by forging Mrs. Cargile's signature to both the second and third affidavits. Respondent denies that he signed the second affidavit. He admits that he signed Mrs. Cargile's name to the third affidavit, but denies that it was forgery because she gave him permission to sign her name.

¶ 30 A document examiner testified at the PRT hearing that it was highly probable that the signature on the second affidavit was that of Mrs. Cargile. Respondent's secretary testified that she personally opened a letter containing an affidavit bearing the signature of Lucille Cargile. We find that the Bar has failed to prove by clear and convincing evidence that respondent placed Mrs. Cargile's signature on the second affidavit. He hence stands exonerated of this violation.

¶ 31 Respondent admits that he signed Mrs. Cargile's name on the third affidavit, but denies that his conduct constitutes forgery because he had her permission to do so. The evidence on the question of whether Mrs. Cargile gave respondent permission to sign her name is scant. Respondent testified that after learning the second affidavit was defective, he called Mrs. Cargile and she gave him permission to sign her name to the third affidavit. Respondent produced no phone records or other proof that this conversation took place. Mrs. Cargile's niece testified that it would not have been out of character for her aunt to have told respondent to do whatever he needed to do to get the lots transferred because her aunt believed the lots were to be used to provide housing for poor people.

¶ 32 The Bar relies on Mrs. Cargile's deposition testimony that she did not give respondent permission to sign the affidavit. Respondent objected to the admission of Mrs. Cargile deposition testimony as hearsay for which there is no applicable exception under the provisions of 12 O.S.2001 § 2804.[37]

---

36. PRT Hearing Transcript, v. 5: 1184 *et seq.*:

Q. If you had told Mr. Boydston exactly how the affidavits were prepared and executed, what do you think would have happened?
A. I don't know what would have happened. I think Rocky—Rocky was real good at stirring it up pretty good. I don't know. I went in there. I was scared and I shouldn't have been and I was. I don't know what would have happened if I told—
Q. What were you afraid of?
A. Rocky. I mean, you know, as the deposition reflects, I mean, it was a yelling deposition. It was not a civil or cordial deposition at any point. I mean, he was doing all he could to make the situation seem as badly as he possibly could make it seem. He was threatening me with all kinds of stuff from our previous conversations."

Asked why he lied to Boydston, respondent replied,

"In the context of what was going on at that time, I felt Mr. Boydston was accusing me of forging her name, accusing me of criminal acts and I was not doing that and I was denying that."

*See* PRT Hearing Transcript, v. 3: 625.

37. The pertinent provisions of 12 O.S.2001 § 2804 state:

A. "Unavailability as a witness," as used in this section, includes the situation in which the declarant:
* * * * *
4. Is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity; ...
B. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
1. Testimony given as a witness at another hearing of the same or another proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered or, in a civil action or proceeding, a predecessor in interest had an opportunity and similar motive to develop the testimony by direct, cross or redirect examination; ... and
* * * * *
5. A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that:
a. the statement is offered as evidence of a material fact,
b. the statement is more probative on the point for which it is offered than any other

The trial panel admitted Mrs. Cargile's deposition into evidence over respondent's objection.[38] We agree with respondent that Mrs. Cargile's deposition testimony is inadmissible.

¶ 33 The provisions of § 2804.B. permit the use of certain hearsay statements if the declarant is "unavailable." Unavailability is defined in § 2804.A. to include the situation where a declarant is dead. Mrs. Cargile died before this proceeding was heard. Section 2804.B.1. provides that the following is not excluded by the hearsay rule if the declarant is unavailable:

Testimony given as a witness at another hearing of the same or another proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered or, in a civil action or proceeding, a predecessor in interest had an opportunity and similar motive to develop the testimony by direct, cross or redirect examination;

The record reflects that Mrs. Cargile was unavailable to testify at the PRT hearing and that her deposition testimony offered by the Bar was taken in compliance with law in the course of another proceeding, but the record also reflects that respondent did not have an opportunity fully and fairly to meet the issues developed by her testimony at that proceeding. Also, assuming without deciding that a disciplinary proceeding is like a civil proceeding for purposes of § 2804, it is clear from the record that respondent had no predecessor in interest at the earlier proceeding to represent his interests.

¶ 34 Section 2804.B.5 permits the use of the following category of hearsay statements made by an unavailable declarant:

A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that:

a. the statement is offered as evidence of a material fact,

evidence which the proponent can procure through reasonable efforts, and
 c. the general purposes of this Code and the interests of justice will best be served by admission of the statement into evidence. A statement shall not be admitted under this exception unless its proponent makes known to the adverse party, sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.
This section was amended effective 1 November 2002. The only substantive change made by the amendment was the removal of subsection B(5) from § 2804 and its independent enactment as § 2804.1. That section now states;
A. In exceptional circumstances a statement not covered by Section 2803, 2804, 2805, or 2806 of this title but possessing equivalent, though not identical, circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule if the court determines that:
1. The statement is offered as evidence of a fact of consequence;
2. The statement is more probative on the point for which it is offered than any other evidence that the proponent can procure through reasonable efforts; and
3. The general purposes of this Code ... and the interests of justice will best be served by admission of the statement into evidence.
B. The court shall state on the record the circumstances that support its determination

of the admissibility of the statement offered pursuant to subsection A of this section.
C. A statement is not admissible under this exception unless its proponent gives to all parties reasonable notice in advance of trial, or during trial if the court excuses pretrial notice for good cause shown, of the substance of the statement and the identity of the declarant.

38. The provisions of 12 O.S.2001 § 3232 [Use of Depositions in Court Proceedings] govern the use of depositions at trial. They state in pertinent part:
"A. USE OF DEPOSITIONS. At the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition, so far as admissible under the Oklahoma Evidence Code ... applied as though the witness were then present and testifying, may be used against any party who was present or who was represented at the taking of the deposition or who had reasonable notice thereof, in accordance with any of the following provisions:
* * * * *
3. The deposition of a witness, whether or not a party may be used for any purpose if the court finds:
a. That the witness is dead, or
* * * * *
f. Upon application and notice, that such exceptional circumstances exist as to make it desirable, in the interest of justice and with due regard to the importance or presenting the testimony of witnesses orally in open court, to allow the deposition to be used. ..."

b. the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts, and

c. the general purposes of this Code and the interests of justice will best be served by admission of the statement into evidence.

A statement shall not be admitted under this exception unless its proponent makes known to the adverse party, sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.

Having reviewed Mrs. Cargile's deposition testimony, we believe it would not serve the interests of fair and impartial fact-finding to admit it into evidence in this proceeding. Mrs. Cargile often appears in the deposition to be confused by the questions and to be highly subject to suggestion as to the appropriate answers. We are not convinced that Mrs. Cargile's deposition is trustworthy in the absence of respondent having had an opportunity fully and fairly to meet the issues developed by her testimony.

 ¶ 35 Section 2804 incorporates the due process requirement that where im-

portant decisions turn on questions of fact, there must be an opportunity to confront and cross-examine adverse witnesses.[39] We have previously applied the protections of the due process clause to bar disciplinary proceedings.[40] Mrs. Cargile's deposition is inadmissible. Without it there is insufficient proof that respondent did not obtain her permission to sign the third affidavit as he contends. Respondent stands exonerated of this violation.

 ¶ 36 Although the Bar did not allege in the Complaint a violation of ORPC Rule 3.3(a)(1),[41] the trial panel nevertheless found and we agree that respondent violated that rule [42] by falsely stating to the McIntosh County District Court in the first affidavit that he had exercised due diligence in an effort to ascertain the heirs of Clarence Brand and that he had personally checked all reasonably available sources at hand to determine the heirs' identity and whereabouts, including specific records named in the affidavit.[43] Respondent admits that he did not examine every source named in the affidavit, but nevertheless argues that he did not violate ORPC Rule 3.3(a)(1) because that rule authorizes discipline only when a lawyer knows that the statement he is making is false. Respondent contends that he believed

**39.** *Malone v. Malone*, 1979 OK 21, ¶ 6, 591 P.2d 296, 298; *Goldberg v. Kelly*, 397 U.S. 254, 269, 90 S.Ct. 1011, 1021, 25 L.Ed.2d 287 (1970).

**40.** *State ex rel. Okla. Bar Ass'n v. Minter*, 2001 OK 69, ¶ 23, 37 P.3d 763, 773.

**41.** ORPC Rule 3.3(a), 5 O.S.2001, Ch. 1, App. 3–A, states: "A lawyer shall not knowingly:

(1) make a false statement of fact or law to a tribunal;"

**42.** The fact that the Bar did not allege a violation of a particular rule does not affect the range of the court's discretion. It is the duty of this court, not that of the parties, to examine the facts *de novo* and determine which ethical rules are applicable. *State ex rel. Okla. Bar Ass'n v. Bolusky*, 2001 OK 26, ¶ 8, 23 P.3d 268, 272. Compliance with due process simply requires the Bar to allege facts sufficient to put the accused lawyer on notice of the conduct upon which the charges of professional misconduct are based. *State ex rel. Okla. Bar Ass'n v. Johnston*, 1993 OK 91, ¶ 19, 863 P.2d 1136, 1143 ("The Bar need only

plead sufficient facts that will put the accused attorney on notice of the charges and give him an opportunity to respond to the facts alleged."). *See also State ex rel. Okla. Bar Ass'n v. Giger*, 2003 OK 61, ¶ 14, n. 17, 72 P.3d 27, 34, n. 17.

**43.** The first affidavit states:

"This affiant further states that Plaintiff's Attorney have (sic) exercised due diligence to ascertain the manes (sic) and residences of the Defendants to be served by publication in the above entitled cause of action by personally checking all reasonably available sources at hand to determine the whereabouts of the Defendants to be served by publication, and each of them, including the examination of the local tax rolls, deed records, Abstract of Title on the property involved herein and the judicial records, as will (sic) as, all secondary sources available, including, but not limited to, the telephone directories and the local city directories before they resorted to the use of publication process against those Defendants to be served by publication."

at the time he executed the affidavit that he had conducted a diligent search.

¶ 37 We find this argument unpersuasive. Respondent admitted to the trial panel that he did not examine every source named in the affidavit. Even if he believed that what he did constituted a diligent search, his representation regarding the specific sources he examined would be false. Moreover, we conclude that respondent could not have reasonably believed he had conducted a diligent search when he had in fact not consulted each of the sources named in the affidavit. We agree with the trial panel that respondent's conduct violated ORPC Rule 3.3(a)(1) and determine that his conduct was in breach of RGDP Rule 1.3.

¶ 38 We also find that respondent violated ORPC Rules 8.4(c) and 3.3(a)(1) when on the third affidavit he notarized Mrs. Cargile's signature as hers knowing that it was not. An affidavit is one of three modes authorized by statute for giving testimony.[44] An affidavit is a written evidentiary statement given under oath. It may not be made by proxy any more than oral testimony may be given by proxy. The affidavit in this case recites that Lucille Cargile was duly sworn. She was not. The jurat certified that Mrs. Cargile personally appeared before respondent, signed the affidavit, and swore to the truth of the statements contained in it. None of this was true and having respondent's permission to sign the affidavit does not make it true. The evidence is clear and convincing that respondent' s false jurat of Mrs. Cargile's signature on the third affidavit violated ORPC Rule 8.4(c) and 3.3(a)(1) as well as RGDP Rule 1.3.

*Count 2*

¶ 39 In 1998 Mayor Johnson was charged with several crimes involving his conduct as mayor of Eufaula. Respondent, who was involved in the events that gave rise to the criminal charges, was deposed by Johnson's attorney in an evidentiary hearing held in connection with the criminal proceeding. Johnson's attorney asked respondent whether he would characterize the answers he had given Boydston in the Cargile deposition as truthful. Respondent replied yes, save one.[45] The Bar alleges that respondent gave many false answers in the Cargile deposition so that his response in the evidentiary hearing that his answers were all true save one was false and violates RGDP Rule 1.3 and ORPC Rules 8.4(b), 8.4(c), and 3.3.[46] Respondent argues that when he said at the evidentiary hearing that all of his answers in the Cargile deposition "save one" were true, he did not literally mean that he had given only a single false answer to a single question. Rather, he meant that all of his answers were true except for those—admittedly more than one—related to the signing of the third affidavit.

¶ 40 The Bar in its brief lists seventeen answers given by respondent in the Cargile deposition which it claims were false, some of which are on matters unrelated to the third affidavit. It is unnecessary to go through the Bar's list. Even if respondent's false testimony in the Cargile deposition were limited to questions relating to the third affidavit, we would still find that his testimony in the Johnson evidentiary hearing was false and misleading. Not only did he testify in that hearing that he gave just one false answer in the Cargile deposition, but when asked identified a single answer as being false [47] when in fact he had spun a web

**44.** *See* 12 O.S.2001 § 421. The other modes are testimony by deposition and testimony by oral examination. The term oral examination means testimony *viva voce* or living testimony in open court. BLACK'S LAW DICTIONARY, Seventh Ed.1999 pg. 1567; CHAMBERS'S TWENTIETH CENTURY DICTIONARY, London & Edinburgh, 1943, pg. 1206.

**45.** The question and respondent's answer in the evidentiary hearing were:
Q . . . .Would you characterize the answers that you gave under oath in that deposition as being truthful answers?

A. Save one, yes.

**46.** *See supra* note 41 for the provisions of ORPC Rule 3.3(a)(1).

**47.** The critical question and answer in the evidentiary hearing were:
Q. What statement did you make under oath that you alleged is false in that deposition, Mr. Dobbs?
A. Mr. Boydston asked me if I had affixed a signature to an affidavit by Lucille Cargile. I told him I had not when in fact I had done so at her request.

of false answers related to the third affidavit. In evaluating his credibility, the trial judge needed to know the extent of his fabrication in the Cargile deposition about the events surrounding the third affidavit. We find sufficient evidence that respondent violated RGDP Rule 1.3 and ORPC Rules 8.4(b) and (c). We exonerate respondent of the alleged violation of ORPC Rule 3.3. That rule addresses professional misconduct *as an advocate* for making false statements to a tribunal, not false statements by a lawyer as a witness.

### Count 3

¶ 41 The Bar accuses respondent in Count 3 of the Complaint of violating ORPC Rules 8.4(b) and 8.4(c) by testifying falsely in the Johnson criminal trial evidentiary hearing that Mrs. Cargile had given him permission to sign her name to the third affidavit. We have already found in Count 1 of the Complaint insufficient evidence to prove that respondent did not have Mrs. Cargile's permission to sign her name to the third affidavit. Likewise, there is insufficient evidence to prove that he lied in the Johnson criminal trial evidentiary hearing when he claimed he had her permission. Respondent stands exonerated of this violation.

### Count 4

¶ 42 The Bar accuses respondent in Count 4 of the Complaint of violating ORPC Rule 8.4(c) by giving false testimony in the Cargile deposition when he said that he had no relationship whatsoever with Mayor Johnson. We set forth below the series of questions and answers that concluded with that response:

Q. Okay. Had you talked to anyone else about these lots before you called her [Mrs. Cargile]?

A. Yes, I had.

Q. And who had you talked to?

A. Mayor Joe Johnson had talked to me about these lots.

Q. When did he first talk to you about them?

A. Some time prior to me talking to her.

Q. And what was the nature of that conversation?

A. He told me that there was some lots here in the town that they were having to maintain and they kept having to mow them and what not. And there was this little lady that might have them, that might be interested in selling them. And he thought it would be a good opportunity for me to buy them.

Q. Okay. So he told you that they might be available. And did he indicate to you that he had talked to this lady before?

A. Oh, I imagine he had, yes.

MR. CROWDER [Dobbs' Attorney]: I'd like to caution the witness not to speculate, to answer the question.

THE WITNESS: He hadn't told me that, but I assumed he had.

(Questions continued by Mr. Boydston)

Q. Okay. And this would have been how long before you actually talked to the lady?

A. I don't know.

Q. *Okay. Now, at that time, what was your relationship with Joe Johnson?*

A. *None whatsoever.* (emphasis added)

The Bar contends that when Johnson first called respondent about the Cargile lots, he did not just offer him the opportunity to buy them, but also made an agreement with respondent that the two of them would buy the lots together, with respondent acting as the front man. Hence, the Bar maintains that respondent's last answer—that he had no relationship whatsoever with Johnson—was false and misleading. Respondent testified that he thought Boydston was asking him if he had a professional relationship with Johnson such as that of city attorney. Since he did not work for the City of Eufaula, respondent argues his answer was true.

¶ 43 Without at this time addressing whether the proof supports the Bar's contention that respondent and Johnson agreed to purchase the lots together, we decline to discipline respondent for this answer. Although we see nothing in the deposition that supports respondent's interpretation of the question Boydston was asking, neither do we view his answer as misleading. Whatever else respondent may have meant, he could

not have meant literally that he had no relationship at all with Johnson when he had testified just a few questions earlier that Mayor Johnson had *called him* to talk to him about the lots and had *offered him* the opportunity to buy them. Clearly, there was a prior relationship between the two men for the mayor to have called respondent in the first place. Boydston could not reasonably have been misled by respondent's answer and could have pursued the matter further if he was interested in determining just what their relationship was. Respondent stands exonerated of this violation.

### Count 5

¶ 44 The Bar alleges in Count 5 of the Complaint that respondent violated ORPC Rules 8.4(b) and 8.4(c) by giving false answers under oath in the Cargile deposition to three questions relating to whether anyone else was involved in the Cargile lots transaction. Respondent denies that his answers were false.

¶ 45 First, the Bar alleges that respondent's answer to the following question in the Cargile deposition was untrue:

Q. From the beginning, was it your intention to buy those [the lots] for your own account?

A. Yes, sir.

¶ 46 The Bar contends that respondent's answer was false because he and Johnson agreed when they first discussed the lots that they would purchase them together. Respondent denies this, but his story has not been consistent. He now contends that he originally bought the lots by and for himself, but that he and Johnson came to an agreement or understanding *some time later* that they would split the profit when the lots were sold. In order to determine whether respondent's answer to Boydston's question was false, we must decide whether the Bar has proved by clear and convincing evidence that

respondent and Johnson agreed from the beginning to buy the lots together as partners.

¶ 47 The only *sworn testimony* in the record that there was such an agreement is Johnson's, who testified before the trial panel that when he first called respondent about the lots, they agreed to purchase them together. The credibility of Johnson's testimony must be considered in light of his felony convictions, which were obtained in part on the basis of respondent's testimony, and the assessment of the prosecutor in Johnson's criminal case that Johnson is not a person who can be trusted.[48] In addition, certain uncontradicted physical facts undermine Johnson's testimony. Respondent alone paid for the lots, the deed from Mrs. Cargile conveys the property to respondent alone, Johnson never contributed time or money to the lots' upkeep, and Johnson never reimbursed respondent for the financial loss he ultimately suffered when the transaction turned sour.

¶ 48 Respondent has testified on several occasions under oath about Johnson's part in the purchase of the Cargile lots. The first time was in the Cargile deposition—the very question and answer which is the subject of this allegation. That respondent's testimony might not be true came to the Bar's attention in 1995 when the Bar received Dobbs' written response to a grievance letter submitted by Rocky Boydston, the attorney who had represented the Brand heirs in the Cargile matter.[49] In his response, Dobbs offered as "background information" that Mayor Johnson had approached him and asked him if he "would like to go in halves on the purchase" of the lots. He also wrote that he told Mrs. Cargile during their initial conversation that he would be buying the lots with Johnson and that they "would be going in one-half each on the property." He also said in the response that when Mrs. Cargile questioned him about what he intended to do with the

---

**48.** The prosecutor testified at the PRT Hearing about Johnson's truthfulness as follows:
"Q. What is your opinion of Joe Johnson's truthfulness?
A. If he were to tell you that the sky is blue and the sun is shining, you should go out and check it."

**49.** Boydston was representing Joe Johnson in the criminal case in 1995 when he sent the grievance letter to the Bar.

lots, he told her that "*we* were going to sell the property if *we* had the opportunity" and that "*we* intended to resell the lots." (emphasis added) Comparing these statements with respondent's sworn testimony in the Cargile deposition, the Bar had reason to believe that respondent's Cargile deposition testimony to the effect that no one else was involved in the lots' purchase was false.[50]

¶ 49 Respondent's second opportunity to testify under oath about who was involved in the purchase of the Cargile lots came in the deposition he gave in this proceeding. Respondent maintained that his Cargile deposition testimony was truthful, but gave convoluted, contradictory, and unintelligible answers about Johnson's part in the transaction, some of which—to the extent it can be understood at all—supports the Bar's contention that he and Johnson were partners in the purchase of the lots. For example, the following exchange took place:

Q. If you go to Page 15 [of the Cargile deposition] and look at Line 3: "From the beginning was it your intention to buy those for your own account?" "ANSWER: Yes, sir."

A. Uh-huh.

Q. Is that a truthful answer?

A. Yes.

Q. You weren't involved in some kind of deal with Joe Johnson to go in halves on those lots?

A. Well, the answer to the question is correct. I did do it for my own personal benefit.

Q. For your own account?

A. For my own account.

Q. Was Joe Johnson involved in that?

A. Yes.

Q. In what way?

A. He was going to receive half of it.

Q. Why didn't you tell him that?

A. He didn't ask me that.

Q. He did ask you that. "From the beginning was it your intention to buy those for you own account."

A. For my own account. It was.

Q. Go to Page 46, Line 4. "QUESTION: And you intended to keep all the profit?" Line 5: "ANSWER: You bet I did."

A. Uh-huh.

\* \* \* \* \*

Q. Was that truthful?

A. Yes, I did intend to keep all the profit.

Q. How was it that you and Mr. Johnson were going in halves on this lot, then, if you intended to keep all the profit?

A. Well, I bought the lots. They're mine.

Q. Okay.

A. They were mine.

Q. If you'll look at Complainant's Exhibit No. 8. That's your response.

A. Uh-huh.

Q. Paragraph 3—this is your response to the grievance by John Boydston dated May 7, 1997.

A. Uh-huh.

Q. Paragraph 3: "As background concerning this grievance, I was approached by Joe Johnson, mayor of Eufaula, who asked me if I would like to go in halves on the purchase of a piece of property here in Eufaula."

A. That's correct.

Q. How could you be intending to keep all the profit if you and Joe Johnson were going to go in halves on this lot?

A. I didn't intend to tell you that I was going to keep all the profit. The profit was going to me, though. And if I split it with Joe, that was what I intended to do with it. But we intended to split it.

Q. Well, didn't you tell Mr. Boydston under oath that you intended to keep all the profit, in this deposition?

A. Yes, I did.

Q. Was that truthful?

---

**50.** Carefully parsing his written statement to the Bar, respondent argues in his brief that he never actually said in that writing that he and Johnson *agreed* to purchase the Cargile lots together. Rather, he claims that he only said that Johnson *approached him* about going in halves on the lots. We are not persuaded by this strained exercise in linguistic parsing. The commonsense understanding of Dobbs' written response to the Bar is that he and Johnson agreed to purchase the lots as partners. For the text of respondent's written response on this point, *see* text at page 57.

A. Yes, I think that it is.

Q. You intended to keep all the profit—that's what you told him under oath—but then you intended to split it with Joe Johnson?

[Objection raised by Dobbs' attorney that the questioner was becoming argumentative.]

Q. Can you reconcile that for me, Mr. Dobbs, your testimony that you intended to keep all the profit, but then you had it in your head that you were going to split that with Joe Johnson?

[Dobbs' attorney suggests how he might respond]

The Witness: I think I've answered the best that I can.

Throughout his Bar deposition, respondent continued to insist on the truthfulness of his Cargile deposition answers about Johnson's part in the Cargile lots' purchase, but he could never reconcile that testimony with his written response to the Bar in the Boydston grievance.

¶ 50 Respondent's third opportunity to testify on this matter came at the PRT hearing. Again, he insisted that his testimony in the Cargile deposition that no one else had been involved in the purchase of the lots was truthful and submitted that his written response to the Bar was inaccurate with respect to Johnson's involvement. He explained that because Boydston's grievance had absolutely nothing to do with Johnson's interest in the lots, he was not focusing on the details of the purchase when he prepared the written response. Consequently, he had conflated events and related them out of sequence. What had really happened, he now testified, was that he and Johnson had come to a vague and informal understanding at some indeterminate time after he purchased the lots that Johnson would share in the profit from the sale of the lots, at least if

he produced a buyer. He explained his failure to offer this simple explanation earlier by saying that he thought the Bar deposition would be limited to his testimony regarding the affidavits in the quiet title action [51] and he had been taken by surprise when the Bar questioned him about his arrangement with Johnson.

¶ 51 In the face of such conflicting and confusing testimony, we must be mindful that the Bar has the burden of proving facts by clear and convincing evidence. We find the evidence is not clear and convincing that respondent and Johnson initially agreed to buy the Cargile lots together. We are particularly persuaded by the uncontroverted facts that respondent alone paid for the lots, received the deed solely in his name, paid for the lots' upkeep himself, and suffered the financial loss alone when the transaction went sour. If he and Johnson had been partners, one would expect Johnson to have at least relieved respondent of a portion of the upkeep expenses and financial loss respondent ultimately suffered. Johnson was not asked and hence never explained why he did not reimburse respondent for his share of the expenses and loss if they were partners. In all of respondent's *sworn* statements he consistently testified that he and Johnson were not partners when he purchased the lots from Mrs. Cargile. Even though we are troubled by his deplorable Bar deposition testimony and his belated recollection that the understanding he had with Johnson to split the profits on the lots' sale arose only some time after he bought the lots, we nevertheless find the evidence insufficient to prove that respondent and Johnson had an agreement from the beginning to purchase the Cargile lots together.

¶ 52 Having made this finding, we must conclude that the Bar has failed to prove by clear and convincing evidence that respon-

---

**51.** PRT Hearing Transcript, v. 3: 609:
Q. Why did you not tell me, at the time I took your deposition, that you and Mr. Johnson did not have that agreement until later on?
A. When you—when you took my deposition, I had not read my previous testimony in Ms. Cargile. I haven't read it since 1993. I'd also not read my response. At the time, I did not feel that whether my—what my deal was with Mayor Johnson, one way or the other, was even relevant to the Cargile matter. I knew what my problems had been in the Cargile matter. Mr. Boydston and I had communicated about my problems in the Cargile matter and I always thought the Cargile matter sounded—centered solely upon all of the signatures on these affidavits.

dent lied in the Cargile deposition when he said that he bought the Cargile lots for his own account. Respondent stands exonerated of this violation.

¶ 53 Next, the Bar alleges that respondent testified falsely under oath when he said in the Cargile deposition that no one else had a financial interest in the lots. We set forth below the critical series of questions and answers:

Q. Now, on this lot, did anyone else have a financial interest in it besides yourself?

A. No.

Q. So you paid all the money and it was all your money?

A. You bet.

Q. And you intended to keep all the profit?

A. You bet I did.

With the exception of the second question [So you paid all the money and it was all your money?], the series of questions as a whole is not directed to the date of the lots' purchase. Accepting as true respondent's chronology of events, by the time Boydston deposed respondent in 1993 he and Johnson would have come to the understanding that he and Johnson would split the profit from the lots' sale. Respondent knew or should have known from the counterclaim brought by the Brand heirs that Boydston wanted to know whether anyone else was involved in what he alleged was an attempt by Mrs. Cargile, respondent, and unnamed others to defraud his clients. Respondent's answer denying that anyone else had a financial interest in the lots and his answer that he intended to keep all the profit were false and misleading.

¶ 54 Respondent also defends his answer to this question by testifying that he understood the phrase "financial interest" to mean cash investment and since Johnson had no cash invested in the lots, his answer was true. We are not persuaded. If a person stands to profit from a venture, that person

has a financial interest whether or not that person made a cash investment. Respondent had been out of law school for three years when he gave this deposition in the Cargile matter and he had worked for several years before attending law school. We do not believe that a person of his age and experience would have had such a narrow understanding of the question Boydston was asking, particularly in light of the underlying lawsuit. Moreover, after Boydston asked respondent if he had paid all the money, he asked him in the very next question if he intended to keep all the profit. Even if respondent's first reaction had been that he was being asked who had put up the money to purchase the lots, it should have been clear by the last question that Boydston's focus was not that narrow.

¶ 55 Finally, the Bar alleges in Count 5 that respondent's negative answer in the Cargile deposition to the question of whether anyone else stood to profit from the sale of the lots was untrue. The critical question and answer are:

Q. Okay. Is there anyone else who stood to profit from these lots, these transactions?

A. No.

Again, the question has no chronological reference point. It asks if anyone stood to profit from the sale of the lots without regard to any particular point in time. Respondent's answer was false. Johnson stood to profit if the lots were sold. Respondent's claim before the trial panel that the context in which the question was asked led him to believe that Boydston was asking him if any of the *heirs* was going to profit from the lots is not supported by the record.[52]

¶ 56 In summary, we find that respondent gave false testimony in the Cargile deposition in two of the three instances alleged by the Bar in Count 5 of the Complaint. We conclude that in doing so, respondent violated the provisions of ORPC Rules 8.4(b) and 8.4(c).

---

52. The context in which the question was asked was not as respondent contends a discussion of the heirs, but rather a discussion about a possible purchaser for at least one of the lots and whether respondent had told any of the heirs about the potential for making a profit on the sale of the lots. It is clear from the context of the entire discussion at that point in the deposition that Boydston was not asking whether other heirs stood to profit.

*Count 6*

¶ 57 The Bar charges respondent in Count 6 of the Complaint with violating ORPC Rule 8.4(c) and RGDP Rule 5.2 [53] by providing false and misleading information to the Bar when he wrote the following in his written response to Boydston's grievance:

"As background concerning this grievance, I was approached by Joe Johnson, Mayor of Eufaula, who asked me if I would like to go in halves on the purchase of a piece of property herein (sic) Eufaula. He told me that the owner of the property, Lucille Cargile, would probably want to sell the lots because the City was charging her for up-keep. I do not recall how I located Mrs. Cargile, but I talked to her on the telephone several times in the course of our dealing.... During our initial conversation, Mrs. Cargile told me Joe Johnson had called her about the lots some weeks earlier. I told her I was buying these lots with Mr. Johnson and that he and I would be going in one-half each on the property."

Respondent's representation that Johnson approached him about "going in halves on the property" is inconsistent with his sworn testimony that Johnson initially called only to inform him of the opportunity to buy the lots.[54] The written response was false and misleading. It violates ORPC Rule 8.4(c).

¶ 58 RGDP Rule 5.2 authorizes professional discipline when a lawyer makes a *deliberate misrepresentation* in a response. The word deliberate means something done only after careful consideration.[55] Respondent's misrepresentation contradicted his sworn testimony in the Cargile deposition. It provided the Bar with reason to suspect that his false testimony in the Cargile deposition was far more extensive than Boydston alleged in his grievance. There was no ad-

**53.** The provisions of RGDP Rule 5.2, 5 O.S.2001, Ch. 1, App. 1–A, state in pertinent part that after the General Counsel files and serves a grievance upon a lawyer, the lawyer

"shall thereafter make a written response which contains a full and fair disclosure of all the facts and circumstances pertaining to the respondent lawyer's alleged misconduct unless the respondent's refusal to do so is predicated upon expressed constitutional grounds....The failure of a lawyer to answer within twenty (20) days after service of the grievance (or recital of facts or allegations), or such further time as may be granted by the General Counsel, shall be grounds for discipline. The General Counsel shall make such further investigation of the grievance and response as the General Counsel may deem appropriate before taking any action."

**54.** PRT Transcript Hearing, v. 3: 607–608:

Q. Did you talk to Mr. Johnson about Mrs. Cargile or a lot that she owned or some lots?
A. Yes.
Q. Tell the Trial Panel what first happened when you talked to Mr. Johnson about that.
A. When I first talked with him, he just told me that there was a lady that might want to sell some lots. Told me where they were and that I might want to contact her about those.
Q. Was there any talk about you and he splitting profits at that time?
A. No, there was not.
Q. When was that first discussed, about splitting the profits?
A. I believe after I got the property into my name or some—well, when I made a discus-

sion with Ms. Cargile, I may have told her that, I'm not for sure. I don't recall exactly when my discussion with Mr. Johnson exactly was regarding the splitting of the profit.
Q. Do you remember mentioning that in your response to the bar association?
A. Yes, I do remember that.
Q. What did you say in your response to the bar association?
A. I think I said that I had said I was going to split it in half with Joe Johnson in my response.
Q. And you testi—do you have a copy of your response handy? If you don't, I'll give you one.
A. No, sir, I do not.
Q. (Handed copy to witness.)
A. Thank you.
Q. Will you look at the first page of that, Mr. Dobbs?
A. Yes.
Q. And the third paragraph that starts as background?
A. Uh-huh.
Q. As background concerning this grievance, I was approached by Joe Johnson, Mayor of Eufaula, who asked me if I would like to go in halves on the purchase of the piece of property.
A. Yes.
Q. Is that what happened?
A. I'm—not sure exactly that was the first thing that happened. That is what happened at a time though, that is correct.

**55.** The word deliberate comes from the Latin *deliberatus*, past participle of *deliberare*. It means to weigh or consider carefully. *See* MER-

vantage gained by respondent in making this misrepresentation since Boydston's grievance had nothing to do with respondent's relationship with Johnson. The evidence does not support a finding that respondent made a deliberate misrepresentation of this fact, but rather suggests a reckless indifference to the truth. Respondent stands exonerated of this charge.

¶ 59 Respondent also wrote in his response to the Bar that he told Mrs. Cargile during their initial conversation that he and Johnson would be purchasing the lots together. Respondent testified at the Bar deposition that he "probably" told her this in their first conversation. In his testimony before the trial panel he said he did tell her this, but not during their initial conversation.[56] Whether respondent was telling Mrs. Cargile the truth is a separate matter, but there is not clear and convincing evidence that respondent did not tell Mrs. Cargile that he and Johnson would be purchasing the lots together. He could have told her this even though it was not true as a means of introducing himself and connecting himself to Mayor Johnson since Johnson had already spoken to Mrs. Cargile about the lots. Respondent stands exonerated of this charge.

### Count 7

¶ 60 The Bar alleges in Count 7 of the Complaint that respondent violated ORPC Rules 8.4(c), 4.1 [57] and 4.3 [58] when he contacted one of the Brand heirs, Pat Cepowski, and asked her to quitclaim her interest in the Cargile lots to him and to assist him in obtaining quitclaim deeds from the other Brand heirs. The Bar alleges that in the course of his conversation with Cepowski, respondent made the false statement to her that the lots were going to be used for housing for poor people. The Bar also alleges that respondent did not disclose to Cepowski that he and Johnson intended to profit from the sale of the lots. Respondent denies that he misrepresented to Cepowski his intentions for the lots' use. Cepowski did not testify at the PRT hearing. The trial panel found insufficient evidence to support the imposition of discipline for these alleged misrepresentations. We agree. Respondent stands exonerated of this violation.

¶ 61 We nevertheless find that respondent's contact with Cepowski violated ORPC Rule 4.3, which governs a lawyer's conduct toward persons not represented by counsel. It prohibits a lawyer from giving advice to an unrepresented person other than the advice to secure counsel if the interests of the unrepresented person are, or have a reasonable possibility of being, in conflict with the interests of the lawyer's client. We find that respondent gave "advice" to Pat Cepowski other than advice to secure counsel when there was a reasonable possibility that her interests were in conflict with those of Mrs. Cargile.[59]

### Count 8

¶ 62 The Bar alleges in Count 8 of the Complaint that respondent violated the provisions of ORPC Rule 1.8. That rule states in pertinent part:

---

RIAM-WEBSTER THIRD INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED, 596 (1961).

**56.** PRT Hearing Transcript, v. 3: 855 and v. 4: 979.

**57.** The provisions of ORPC Rule 4.1, 5 O.S.2001, Ch.1, App. 3–A, state:
In the course of representing a client a lawyer shall not knowingly:
(a) make a false statement of material fact or law to a third person; or
(b) fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited by Rule 1.6.

**58.** The provisions of ORPC Rule 4.3, 5. O.S.2001, Ch.1, App. 3–A, state:
In dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested. A lawyer shall not give advice to such a person other than the advice to secure counsel, if the interests of such person are, or have a reasonable possibility of being, in conflict with the interests of the client.

**59.** Advice is defined as "an opinion or recommendation offered as a guide to action." WEBSTER'S ENCYCLOPEDIC UNABRIDGED DICTIONARY OF THE ENGLISH LANGUAGE 21 (Gramercy Books 1996). See Estate of Holcomb, 2002 OK 90, ¶ 35, 63 P.3d 9, 20.

(a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:

(1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client;

(2) the client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and

(3) the client consents in writing thereto.

The Bar accuses respondent of having violated this rule by entering into a business transaction with Mrs. Cargile without following the procedures mandated by the rule.[60] Respondent argues that the rule does not apply because when he entered into a business relationship with Mrs. Cargile she was not his client. We agree with respondent that ORPC Rule 1.8 does not apply. When respondent negotiated the purchase of the lots from Mrs. Cargile, she was not his client. Respondent stands exonerated of this violation.

### Count 9

▇▇ ¶ 63 The Bar alleges in Count 9 of the Complaint that respondent violated RGDP Rule 5.2 and ORPC Rule 8.4(c) when he wrote in his response to Boydston's grievance, "I honestly answered all of Mr. Boydston's questions, except when he asked if I placed Mrs. Cargile's signature on the third affidavit." Having previously found that respondent was untruthful in the Cargile depo-

sition about more than just his signature on the third affidavit, we find clear and convincing evidence that the statement challenged in Count 9 of the Complaint is a deliberate misrepresentation of his Cargile deposition testimony in violation of the provisions of RGDP Rule 5.2 and ORPC Rule 8.4(c).

### Count 10

▇▇ ¶ 64 The Bar alleges in Count 10 of the Complaint that respondent violated ORPC Rules 8.4(b) and 8.4(c) by ordering his secretary, a notary public, to notarize an affidavit bearing Mrs. Cargile's signature when the notary did not personally observe Mrs. Cargile execute the document. Respondent admits the conduct and admits that it constitutes a violation of ORPC Rule 8.4(c), but denies that his conduct violated Rule 8.4(b). The trial panel found that the conduct violates both rules. We find that the alleged misconduct violates ORPC Rule 8.4(c).

▇▇ ¶ 65 In order to establish a violation of ORPC Rule 8.4(b), the Bar must prove by clear and convincing evidence that a respondent has committed a criminal act which indicates a lack of those characteristics relevant to the practice of law. Respondent has not been charged with or convicted of a crime in connection with having directed his secretary to execute a false jurat. The Bar in Count 10 does not identify the Oklahoma statute it contends makes respondent's conduct a crime. No act is a crime in this state unless made so by statute.[61] The essential elements of a crime are determined from the statutory provisions defining the offense.

---

60. The provisions of ORPC Rule 1.8(a), 5 O.S. 2001, Ch. 1, App. 3–A, state:

A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:

(1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client;

(2) the client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and

(3) the client consents in writing thereto.

61. *See* the provisions of Title 21 O.S.2001 § 2 which state: "No act or omission shall be deemed criminal or punishable except as prescribed or authorized by this code. The words "this code" as used in the "penal code" shall be construed to mean "Statutes of this State." " All crimes are statutory. *World Publishing Co. v. White*, 2001 OK 48, ¶ 13, 32 P.3d 835, 843; *Morrison v. State*, 1990 OK CR 33, ¶ 7, 792 P.2d 1189, 1192.

We cannot determine whether respondent has committed a crime here because we have not been apprized by the Bar of the statutory provision defining the offense alleged to have been committed. In bar disciplinary proceedings the prosecutorial function is delegated to the State Bar. It is up to the prosecutor—the Bar—to identify the applicable criminal offense. Unlike the perjury allegations earlier in this opinion, the applicable statutory provision defining the offense in this Count of the Complaint is not obvious. Without the Bar's detailed guidance in this respect, we cannot find that respondent violated the provisions of ORPC Rule 8.4(b). He hence stands exonerated of this violation.

### Count 11

¶ 66 On 22 March 2001 the Bar deposed respondent in this proceeding. It charges respondent in Count 11 of the Complaint with violating ORPC Rule 8.4(c) by testifying falsely in the Bar deposition that his false testimony in the Cargile deposition was limited to questions about the third affidavit when he had in fact testified falsely about other matters. We have already found that respondent gave false testimony in the Cargile deposition about more than just the third affidavit. We find that the Bar has proved by clear and convincing evidence that respondent violated ORPC Rule 8.4(c) as alleged in Count 11.

### IV

### COUNTS 12–14: THE WATER COMPANIES

¶ 67 In 1981, the First National Bank and Trust Co. of Ponca City, as trustee for bondholders, sued the Eufaula Utilities Authority for failure to make payments on its 1968 series revenue bonds and sought to foreclose on the property securing the bonds. Among that property were undeveloped residential lots in two developments, one known as River Oaks Estates and the other as Eagle Bluff Estates, and a water distribution system. Judgment was granted to the trustee bank in 1988 and the court ordered the assets sold at sheriff's sale.

62. PRT Hearing Transcript, v. 2: 340.

¶ 68 Mayor Johnson, Randy Bridges, a Eufaula businessman and friend of Johnson's ("Bridges"), and Kenneth Lackey, the Eufaula city attorney and attorney for the Eufaula Utilities Authority ("Lackey"), agreed that Bridges would attend the sheriff's sale and bid on the property.[62] The sale was held in April 1989 and Bridges purchased the property for $40,000.00. An order was entered approving the sale and ordering the sheriff to issue deeds to the lots and a bill of sale for the water distribution system to Bridges. On the same day, Bridges and Lackey executed a note at State National Bank in Eufaula ("SNB") for $45,000.00 for the stated purpose of purchasing a business. The River Oaks Land Company was also listed as a borrower. Three days later, Bridges, Lackey, and Mayor Johnson's wife, filed articles of incorporation with the Oklahoma Secretary of State, forming four companies: the River Oaks Land Company, the River Oaks Water Company, the Eagle Bluff Land Company, and the Eagle Bluff Water Company. The assets purchased by Bridges at the foreclosure sale were transferred to these four companies. The River Oaks Water Company and the Eagle Bluff Water Company purchased water from the City of Eufaula and re-sold it to residents of the two residential developments bearing their names.

¶ 69 Mayor Johnson did not co-sign the SNB note nor did he sign the documents incorporating the four companies. Johnson testified before the PRT that he did not believe he owned stock in any of them. The companies' accountant testified that Johnson did not own any stock in the water companies, but that he did own one-third of the stock in the land companies. Whatever Johnson's ownership interest may have been on paper, it is clear that he exercised many of the incidents of ownership in the water companies. Johnson maintained in his testimony to the trial panel that he never intended to own an interest in the water companies, but conceded that his conduct indeed made it appear that he did. Because the water companies did business with the City of Eufaula,

Mayor Johnson's interest in them constituted an illegal conflict of interest.

¶ 70 Kenneth Lackey was stricken with cancer shortly after the land and water companies were formed and decided to sell his interest. Johnson offered respondent the opportunity to buy into all four companies for $3,000.00, with the apparent understanding that respondent would take care of the day-to-day management of the companies and perform any needed legal services. Respondent agreed and purchased Lackey's interest in early 1991. Respondent also became vice-president of the companies.

*Count 12*

¶ 71 The original note executed by Bridges and Lackey on 17 April 1989 was renewed on 17 April 1990 for another one year period. The renewal note again identified River Oaks Land Company, Randy Bridges, and Kenneth Lackey as the borrowers. By the next maturity date, respondent had acquired Lackey's interest in the companies and he executed it together with Bridges. Inexplicably, they signed the note as corporate officers of the River Oaks *Water* Company instead of the River Oaks *Land* Company.

¶ 72 On 19 December 1991, another renewal note was executed by Bridges and respondent for River Oaks Water Company. Apparently, Bridges did not actually sign this note. Instead, Johnson signed Bridges' name. This note contains the notation "renew of business purchase + 15000.00." The next day, $15,000.00 was deposited into the River Oaks Water Company account. A check in the amount of $2,000.00 was drawn on that account payable to Bridges and deposited into Bridges' business account. Ten days later, a check was drawn on the water company's account in the amount of $10,000.00 payable to Johnson. The bulk of that money was deposited into the Joe Johnson Rental Account.

¶ 73 The next renewal note was executed on 10 September 1993 by Bridges and respondent for the River Oaks Water Company. Again, Johnson apparently signed Bridges' name on the note. An additional $8,500.00 was advanced on this note. The $8,500.00 was deposited into the River Oaks

Water Company account and was used by Johnson to buy a pick-up truck.

¶ 74 The note was last renewed on 7 March 1994 and was signed by respondent alone. No one signed on behalf of River Oaks Water Company although the corporation's name still appears at the top as a borrower along with Dobbs. In the line designated for the purpose of the loan, the following typewritten notation appears: "renewal water loan 6,665.00 to repair" followed by two partially illegible letters. No one was able to explain the meaning of the two letters, but respondent readily admitted that most if not all of the $6,665.00 in new money went into his law practice. Respondent could not explain why the repair notation was placed on the note or what it meant, but insisted at his Bar deposition that he informed SNB's president, Randy Petersen, that the new money would be used for his law practice.

¶ 75 Respondent testified that he informed Johnson and Bridges at the time the note was executed that he was borrowing money in the name of the water company for his own use. He insists they did not object. Johnson testified that respondent never told him he was going to borrow money for his law practice. Johnson said he only learned of it in 1998 and considered it an improper and unauthorized borrowing on the company's credit. Yet, the record clearly shows that Johnson and Bridges borrowed on the water company's credit for their personal use on more than one occasion and that Johnson took cash payments from the company as well.

¶ 76 In 1994 the River Oaks and Eagle Bluff Water Companies were sold to the City of Eufaula Public Works Authority, which as part of the transaction assumed payment of the SNB note.

¶ 77 The Bar alleges in Count 12 of the Complaint that respondent violated the provisions of ORPC Rules 8.4(b) and 8.4(c) by defrauding SNB, his partners, and the City of Eufaula in connection with the 7 March 1994 note. We find insufficient evidence to prove these alleged violations. The water company was used as a personal money trough for all of its owners, but especially

for Johnson. Both Johnson and Bridges milked the company's credit when it suited them. We do not believe that Johnson and Bridges were unaware of or were opposed to respondent's similar use of the company. As for SNB, there is no evidence that it relied on the borrowers' representations as to the use to which money lent was to be put in making loan decisions for the water company account. The debt was unsecured and money advanced on the water company's account was often used for other than water company purposes. Payments were timely made on the water company's note and SNB never suffered any loss. Neither does it appear from the record that respondent's conduct defrauded the City of Eufaula. The price the City paid for the water companies appears to have reflected the actual valuation of the assets less the amount of outstanding debt to the Bank. If the debt assumed by the City had not included the money borrowed by respondent, it appears that the City would have paid more for the acquisition. Respondent certainly benefited from this arrangement, but the Bar failed to prove that the City was swindled. Respondent stands exonerated of the violations alleged in Count 12.

### Count 13

¶ 78 Respondent testified that approximately three or four months after he purchased his interest in the companies, Johnson asked him not to disclose to anyone his (Johnson's) involvement in the water companies. Johnson testified that he did not want voters to associate problems with the water companies' service with him. The Bar contends that Johnson's motive in hiding his interest in the water companies was not political, but was indicative of his guilty knowledge that his ownership of the water companies, which were doing business with the City of Eufaula, constituted a conflict of interest for which Johnson could be—and ultimately was—prosecuted. Respondent denies that he knew Johnson's ownership of the water companies was a conflict of interest and hence illegal, but testified that he went along with Johnson's request by keeping Johnson's name off of any written documents and by generally not mentioning Johnson's involvement.

¶ 79 In 1994, the water companies were experiencing problems that would have been very costly to correct, and Johnson, Bridges, and respondent decided to offer the water companies for sale to the City of Eufaula. At the same time, respondent's relationship with Johnson and Bridges was deteriorating to the point where respondent claims Johnson was becoming physically violent toward him. Respondent wanted to terminate his relationship with Johnson and to this end he sought to have Johnson and Bridges buy out his interest in the four companies. At roughly the same time he was negotiating with Johnson and Bridges to buy him out, respondent was also negotiating a sale of the water companies to the City of Eufaula and its Public Works Authority (collectively "the City").[63] At no time prior to the sale did Johnson or respondent tell City officials that Johnson was a part-owner of the water companies. The Bar asserts that respondent hid Johnson's interest in the water companies from the City because he was desperate to get out from under the water companies' growing liabilities and knew that informing the City of Johnson's interest would nix the sale. Respondent contends that he was not aware of the conflict of interest nor was he desperate to free himself of the water companies' liabilities. He insists that his principal motivation for selling his interest to his partners and for selling the companies to the City was to get away from Johnson.

¶ 80 In 1998, Johnson was charged, *inter alia*, with one count of Obtaining a Thing of Value by False Pretenses in violation of 21 O.S.1991 § 1541.1 and 1541.2 in connection with the sale of the water companies to the City. Paragraph 4 of Count 2 of the Information charging Johnson sets out the specific acts alleged to have constituted the crime:

> "Commencing about February 1994, and continuing through August 1994, the Eufaula Public Works Authority commenced negotiations to purchase the assets of River Oaks Water Company, Inc. and Eagle Bluff Water Company, Inc. The substantial ownership interest in said corporations of

**63.** As mayor of the City, Johnson was also a trustee of the Public Works Authority.

one of the Eufaula Public Works Authority Trustees, defendant Joe Johnson, was never disclosed to the trustees of the Eufaula Public Works Authority, but *it was falsely represented to the other trustees of the Eufaula Public Works Authority by J. Mark Dobbs on behalf of defendants Joe Johnson and Randal Max Bridges that defendant Joe Johnson had no ownership interest.* The Eufaula Public Works Authority, in open meetings held on June 15 and 24, 1994 preceded by the posting of notice and agenda, thereupon approved the purchase of said water companies' assets. The sale of said assets by said corporations to said public trust was prohibited by the Constitution and laws of the State of Oklahoma because of defendant Joe Johnson's ownership in said corporations." (emphasis added)

¶ 81 Johnson was convicted of this count and was sentenced to one year in prison.[64] Respondent cooperated with the prosecution. He was never charged with a crime in connection with the sale of the water companies to the City, but was characterized in the jury instructions as Johnson's accomplice. The Bar alleges in Count 13 of the Complaint that respondent violated ORPC Rules 8.4(b) and (c) by making false representations to the City about Johnson's interest in the water companies.

¶ 82 First, the Bar alleges that respondent misrepresented Johnson's interest in the water companies to Richard Willis and Glenn Pittman, two members of the City Council appointed to negotiate the purchase of the water companies for the City. Willis testified that Pittman specifically asked respondent who were the owners of the water companies and respondent replied that he and Randy Bridges were the owners and that

Johnson had no interest.[65] Willis, who had been the companies' accountant since their inception in 1989, testified that respondent's answer was consistent with his own belief that Johnson did not own an interest in the water companies.[66] Despite a jury's determination that Johnson did own an interest in the water companies, Willis testified that he still does not believe it [67] and hence does not believe that respondent misrepresented anything to him.

¶ 83 Pittman also testified that respondent told him and Willis that Johnson had no ownership interest in the water companies. Two years after this conversation took place and after the OSBI had already begun investigating possible illegality in the City's purchase of the water companies because of Johnson's ownership interest in them, Pittman prepared a notarized memorandum recording respondent's answer. The memorandum was introduced into evidence at the PRT hearing. Despite his testimony that respondent had denied Johnson's ownership interest in the water companies, Pittman three times refused to give a direct answer at the PRT hearing when asked if respondent had misrepresented Johnson's interest.

¶ 84 Respondent testified at the PRT hearing that he had no recollection of Pittman asking him about Johnson's interest in the water companies or of ever telling Pittman and Willis that Johnson had no interest in them. On the other hand, in Johnson's criminal trial, respondent testified that "in casual conversation" with Pittman and Willis *he had mentioned* Johnson's ownership interest in the water companies. He continued to maintain at the PRT hearing that he did not recall either Pittman or Willis *asking him* about Johnson's ownership and that he had not *told* them that Johnson was an owner because *to*

---

64. Johnson was convicted of several other criminal offenses as well and was sentenced to a total of ten years in prison.

65. PRT Hearing Transcript, v.2: 536, 545, and 562.

66. Willis testified that when Kenneth Lackey originally created the four companies, Johnson, Bridges, and Lackey each received one-third of the land companies' stock, but Johnson was issued no stock in the water companies. Two-thirds of the water companies' stock was issued to Bridges and one-third to Lackey. *See* PRT Hearing Transcript, v.2: 551. Willis also testified that Lackey told him the water companies' ownership was structured this way because Johnson as the mayor could not have any interest in the water companies, which were doing business with the City, due to a conflict of interest. *See* PRT Hearing Transcript, v. 2: 551–52.

67. PRT Hearing Transcript, v. 2: 549–50.

*tell someone something* implies an affirmative statement and he had just brought the matter up casually.[68] However many hairs respondent splits in this testimony, the bottom line is that he denies misrepresenting to Pittman and Willis that Johnson owned an interest in the water companies.

¶ 85 The trial panel found the evidence insufficient to prove that respondent lied to Willis and Pittman about Johnson's interest. We agree. Although both Pittman and Willis testified that respondent told them Johnson had no ownership interest in the water companies, we have serious doubts about their credibility. Neither was willing to say under oath that respondent misrepresented Johnson's interest to them. Neither could explain why he did not ask Johnson directly whether he was an owner of the water companies. Willis was the companies' accountant and filed tax returns for Johnson as well. It is difficult to believe he was unaware that Johnson was acting in relation to the water companies as an owner. Finally, Pittman's belated memorialization of the critical conversation, which coincided with the OSBI investigation into the legality of the water companies' purchase by the City, strikes us as suspicious. Respondent stands exonerated of this violation.

■ ¶ 86 The Bar also alleges generally that respondent actively and passively concealed Johnson's ownership interest in the water companies from the City. Two witnesses testified before the trial panel that they heard respondent tell the City Council that he and Randy Bridges owned the water companies while making no mention of Johnson's interest. Respondent insists that such a disclosure was unnecessary because everyone on the City Council already knew that Johnson owned an interest in the water companies. He specifically named four or five City Council members and insisted that they and all the other City Council members had some relationship with each other or with the companies that made it impossible for them

---

68. PRT Hearing Transcript, v.4: 952:

Q. Okay, Mr. Dobbs, will you go to page 166 of that jury trial transcript [referring to the Johnson criminal trial], please?
A. I beg your pardon?
Q. Page 166 of that jury trial transcript? Mr. Dobbs, do you remember this question being asked and this answer given at page 166?
 Question, at line 17: "The answer to my question is: Did you tell Pittman and Willis or not? Yes or no?"
 Line 19, answer: "I believe it came up. I don't recall telling them that Joe was an owner. I do not recall ever saying Joe was an owner."
A. Uh-huh.
Q. Was that question asked and that answer given?
A. That was the asked—asked and answered question, yes.
Q. Why would you say that you did not recall telling them that Joe was an owner, when earlier in your deposition—earlier in that testimony, you both told Tommy Graham [an OSBI agent] about telling Mr. Pittman and Mr. Willis? Why would you then say, later on, you couldn't recall telling them that Joe was an owner?
* * * * *
A. Right. I think—I think the distinction needs to be made as opposed to an affirmative statement, I told them—I said, well, I've got to go talk to Joe since he's an owner. That's what I said at line 16. Mr. Martin's question is, is did I affirmatively state, like in an affidavit or something, that they—he was an owner.

Q. That was not his question, Mr. Dobbs.
A. Do you ever recall? Did you tell Willis and Pittman or not? Yes or no? What I told Willis and Pittman was well, I've got to go talk to Joe. He's an owner in this and I've got to get an agreed on everything and that's how that came about. No—
Q. He didn't ask you about an affidavit.
A. No, no, no. I'm—a statement. I'm saying—
Q. The question was: "The answer to my question is: Did you tell Pittman or Willis—or not? Pittman and Willis or not? Yes or no?" And you say: "I do not recall ever saying Joe was an owner."
A. I'm taking that to mean an affirmative statement of Joe as an owner. I'm answering his specific question. Nothing more. I'm not giving him an explanation to his question or anything. He didn't ask for it.
* * * * *
I was specifically answering his question. That's the specific answer to his question that he is asking. He didn't ask me whether I intimated to them that Joe owned an interest in it. He didn't ask me whether—that it was implied that Joe owned an interest in it.
* * * * *
Q. Go back to page 134, Line 22—I'm sorry. 23. Question: "And you told Mr. Graham that you told Mr. Pittman and Mr. Willis ... Mr. Johnson was a partner in the company".
A. It was a casual conversation. It just came up in the conversation is how it came up, and I answered his question that way.

not to know that Johnson owned an interest in the companies. Respondent contends that the reason no one on the City Council ever asked Johnson directly whether he was an owner of the water companies was because all of them already knew the answer. Respondent called no member of the City Council to testify at the PRT hearing in support of this contention, but points out that for any member of the City Council to now testify that he or she knew of Johnson's interest in the water companies would implicate that person in a crime. Pittman, Willis, and Kay Wall, the city attorney in 1994, denied knowing that Johnson owned an interest. The woman who did the books for the water companies for several years testified that at least two City Council members knew that Johnson owned an interest in the water companies because she talked to them about it. Brenda Otis, the potential purchaser of the Cargile lots, testified that she knew that Johnson owned an interest in the water companies, that it was common knowledge in Eufaula, and that she would be surprised if the members of the 1994 City Council claimed they did not know about Johnson's ownership of the water companies.

¶ 87 While it seems likely that at least some members of the City Council knew of Johnson's interest in the water companies, the evidence does not support respondent's contention that all of them were aware of it. Moreover, even if every member of the City Council as a private individual knew about Johnson's interest, that did not give respondent license to mislead the City Council convened as a public body. City Council members act as representatives of the public. Respondent was obligated to tell the City Council the truth about the companies' ownership regardless of what the members' personal knowledge of Johnson's interest was. Furthermore, City Council meetings are public meetings. Any member of the public who attended meetings where respondent misrepresented the companies' ownership would have been misled. We agree with the Bar that respondent had good reason to want to hide Johnson's interest from the City Council and the public. We simply do not believe that respondent was not aware of Johnson's conflict of interest by the time of the water

companies' sale. We find that the Bar has proved by clear and convincing evidence that respondent withheld from the City Council and the public the fact of Johnson's interest in the water companies in violation of ORPC Rule 8.4(c).

¶ 88 The Bar also accuses respondent of violating ORPC Rule 8.4(b) by misrepresenting to the City Johnson's interest in the water companies. The Complaint does not identify the specific statutory provision defining the crime alleged. While it seems likely that the Bar is accusing respondent of committing the same criminal offense of which Johnson was convicted, we decline to assume what it is essential for the Bar to allege. The absence of this critical information is fatal to the Bar's allegation. Respondent stands exonerated of this violation.

*Count 14*

¶ 89 The Bar alleges in Count 14 of the Complaint that respondent violated ORPC Rules 3.3, 8.4(b), and 8.4(c) by making multiple misrepresentations to the Oklahoma Corporation Commission about the ownership of the water companies. The first alleged misrepresentation took place shortly after respondent purchased his interest in 1991, when he sent the following letter to John Gray, an attorney for the Public Utilities Division of the Corporation Commission:

"March 25, 1991

RE: Eagle Bluff and River Oaks Water Companies

Dear John:

 Per your request I am writing to you to inform you of a change in ownership on both Eagle Bluff Water Company and River Oaks Water Company. The new owners of these companies are Mr. Randy Bridges and Mr. J. Mark Dobbs."

The Bar accuses respondent of misrepresenting to the Commission in this letter the true ownership of the water companies by failing to disclose that Johnson was also a part owner in the companies. The Bar contends that this omission was consistent with re-

spondent's agreement to keep secret Johnson's interest in the water companies.

¶ 90 Respondent testified that when he wrote the letter, it was his understanding that the Commission's change of ownership notification requirement existed for the sole purpose of providing the Commission with the name of a responsible party for purposes of communication and accountability and not for the purpose of determining the identity of every owner of a public utility. In support of this contention, respondent introduced several exhibits consisting of communications from the Commission that were addressed to him alone as the owner even though he had provided Bridges' name to the Commission along with his own. Indeed, the Bar introduced nothing from the Commission that was addressed to Bridges alone or to Dobbs and Bridges jointly. Respondent also testified that John Gray, the letter's recipient, already knew that Johnson was a part owner of the water companies and had indicated to him that as long as the information in the letter was consistent with the way the stock was owned, that would be sufficient. Finally, respondent denies that he was trying to keep Johnson's interest in the water companies secret in March 1991 when he wrote the notification letter, testifying that Johnson had not yet asked him to keep his interest hidden.

¶ 91 John Gray testified that, although he had heard rumors that Johnson owned an interest in the water companies, he did not *know* that to be true. Gray's testimony about the Commission's interest in the identity of a public utility's owners was inconsistent. He initially testified that the Commission was only interested in a company's ownership in order to identify a responsible party. This testimony supported the understanding respondent testified he had of the purpose of the change-of-ownership letter. Yet when pressed, Gray testified that Johnson's ownership share in the water companies would have been of interest to the Commission because the Commission would not have ignored Johnson's conflict of interest if it had been made aware that the conflict existed.

¶ 92 Frank Wolfe, a quality of service specialist for the public utility division of the Commission who first became involved with the water companies in 1989, testified that he heard from the beginning that the water companies were owned by Lackey, Bridges, and Johnson. Although he never directly asked Johnson about his connection to the water companies, he testified that Johnson was the person to whom he and others talked when a decision had to be made by the water companies. Wolfe also testified that the Commission's interest in the ownership of a public utility was solely in having a contact person, but it was not clear whether the position he held in the Commission qualified him to give this opinion.

¶ 93 The trial panel found that respondent hid Johnson's ownership in the water companies in the March 1991 letter in violation of ORPC Rule 8.4(b), 8.4(c), and 3.3. We agree with the trial panel's characterization of respondent's conduct, but conclude that what he did violated only ORPC Rule 8.4(c). Whether Gray or Wolfe knew about Johnson's interest in the water companies is irrelevant. It was to the Corporation Commission that respondent was directing the change-of-ownership representation, not to Gray personally, and he had an obligation to disclose the truth. In his Bar deposition testimony, respondent admitted that he did not disclose Johnson's name in the letter to Gray "because Joe wanted to be kept a silent owner." Respondent testified that two-thirds of the stock in the water companies was in Bridges' name, but that was for public consumption only. In reality, he, Johnson, and Bridges each owned a one-third interest in the companies. Knowing the actual ownership of the companies, respondent nevertheless participated in the scheme to keep Johnson's interest hidden from public scrutiny by falsely reporting to the Commission that only he and Bridges owned interests in the water companies.[69] His contention that

---

**69.** Respondent's thought process about the disclosure of ownership in the water companies is apparent from the following series of questions and answers in his Bar deposition about whether

it would have been fraudulent to omit Johnson's name from the companies' federal tax returns. The Bar did not allege that respondent filed fraudulent tax returns and we are not suggesting

he was merely responding to the Commission's need for the name of a responsible party is not supported by the contents of the letter. If the letter was simply to identify himself to the Commission as the responsible party, he would have had no reason to include Bridges' name in the letter at all or to have characterized himself and Bridges as owners. We conclude that in drafting the letter as he did respondent violated ORPC Rule 8.4(c).

¶ 94 The Bar also alleges that respondent's conduct violated ORPC Rule 8.4(b), but the Complaint does not identify the specific statutory provision defining the crime respondent allegedly committed. If the Bar is alleging that respondent's conduct constitutes perjury, we would have to disagree because respondent was not under oath when he made the challenged statement

to the Commission. We hence exonerate respondent of this violation.

¶ 95 Finally, the Bar alleges that respondent's conduct violated ORPC Rule 3.3. That rule applies to lawyers who fail to disclose essential facts or who make false statements to a *tribunal.* A tribunal is an official public forum that exercises judicial powers. The Commission is charged with supervising, regulating and controlling public service corporations.[70] To this end it exercises judicial powers, but it exercises legislative, and executive powers as well.[71] Only when exercising adjudicative powers does the Commission act as a tribunal. In requiring a change-of-ownership notification letter, the Commission is not exercising adjudicative powers. Hence, respondent's submission of the false information to the Commission in his 25 March 1991 letter does not violate

that he did so. We reproduce respondent's answers on this topic only as indicative of his views on disclosing the true ownership of the companies.

Q. (By Mr. Speegle) Would you represent to the IRS that you and Randy Bridges were the owners of this company?
A. That would have been correct, except he would have been sixty-six percent and me one-third percent.
Q. How would that be correct if in fact Mr. Johnson owned one-third of it?
A. Because that's the way the stock ownership was supposed to be. Whatever Randy did with his interest, that's fine.
Q. Are you telling me, Mr. Dobbs, that you thought it would be okay or you still think it's okay to sign a tax return that goes in to the IRS with fraudulent information on it?
A. Not with fraudulent information, it surely would not be.
Q. Don't you think that would be fraudulent information if it were reflected on that return that Mr. Bridges owned two-thirds of that company when in fact Mr. Johnson owned one-third and Mr. Bridges owned one-third?
A. But he had no stock ownership showing that.
Q. There was never any stock issued, was there?
A. Not that I recall.
Q. And what would stock have to do with it?
A. That was understood.
Q. You understood that you owned a third of it, that Randy Bridges owned a third of it, and that Joe Johnson owned a third of it. Mr. Dobbs, it's a simple question. You either do or you don't sign fraudulent or submit a fraudulent tax return. It's either fraudulent or it's not.
A. I would not submit a fraudulent tax return.

Q. And if you think a tax return that showed you and Randy Bridges being the owners of that company is not fraudulent, then I want to know that.
A. It appears they corrected it, because they had filed an amendment return showing he had sixty-six percent ownership?
Q. Is that the truth?
A. Well, as far as the record is concerned, yes, that was the record owner of sixty-six percent.
Q. That was the record owner. But that was not the true picture, was it?
A. I don't know what you're supposed to file with the IRS with regard to that kind of stuff. I mean, whatever Mr. Willis or Ms. McIntosh put down there—fifty-fifty ain't right.
Q. One third, two thirds ain't right either, is it?
A. As far as the record ownership—
Q. Record ownership, how you portrayed the matter to the world?
A. Yes.
Q. And it was one-third, two-thirds; is that correct?
A. That's correct.
Q. But that was not true, was it?
A. That was not the ownership arrangement, no.
Q. Then is the answer to that question yes. That was not true, was it?
A. I think it was correct, given the circumstances.

70. *Southwestern Bell Telephone Co. v. Corp. Comm'n,* 1994 OK 38, ¶ 5, 873 P.2d 1001, 1004.

71. *Id.*

ORPC Rule 3.3. We exonerate respondent of this violation as well.

¶ 96 By 1994, respondent had decided he no longer wanted to be bothered by the problems of the water companies or to be involved with Johnson and Bridges. He therefore arranged to sell his interest in the companies back to Johnson and Bridges. At roughly the same time, respondent, Bridges, and Johnson decided to sell the water companies to the City and respondent began negotiating the sale. In order to sell the water companies to the City, it was necessary to obtain Commission approval. In this connection, respondent filed documents with the Commission and appeared at Commission hearings. The Bar alleges in Count 14 of the Complaint that in the documents he filed and in his appearances, respondent made false representations to the Commission about the ownership of the water companies.

¶ 97 Respondent's sale of his interest in the water companies to Johnson and Bridges and the sale of the water companies to the City occurred at about the same time. Establishing a precise chronology of events is impossible due to the sloppy state of the documentation of the two transactions and respondent's sometimes vague and/or contradictory testimony about relevant events. Nevertheless, we conclude that the Bar introduced clear and convincing evidence that respondent twice misrepresented to the Commission the ownership of the companies and/or his position as an officer of the companies in violation of ORPC Rules 8.4(c), 8.4(d) [72] and RGDP Rule 1.3.

¶ 98 The record clearly shows that respondent resigned as vice president of River Oaks Water Company on 29 July 1994 and that his resignation was accepted by the company on that date. While there was conflicting evidence as to whether respondent remained *an owner* of the company after 29 July 1994, there was no conflict as to the date *he ceased to be a corporate officer.* Nevertheless, on 1 August 1994 he filed an application with the Commission to sell the River Oaks Water Company to the City and misrepresented himself in that application as the vice-president of the company.

¶ 99 The record also demonstrates that at a hearing before the Commission on 21 November 1994 respondent identified himself as the owner of the River Oaks and Eagle Bluff Water Companies.[73] That was false. The Minutes of a Special Meeting of the Board of Directors of River Oaks Water Company recite that his shares of stock in the company were transferred to Randy Bridges as of 29 July 1994 and according to respondent's testimony, he was paid for his shares in mid-August 1994. By November he had no ownership interest in the companies.

¶ 100 Both of these misrepresentations contributed to the confusion expressed by the Administrative Law Judge in transcripts of proceedings before the Commission on 25 January 1996 and 8 February 1996 regarding various issues surrounding the sale of the water companies to the City. Had respondent not misrepresented himself to the Commission as the owner and vice-president of the companies when he no longer occupied either position, a great deal of time, effort and expense might not have been wasted at the Commission. These misrepresentations constitute a violation of ORPC Rules 8.4(c) and RGDP Rule 1.3. We also view them as a

---

**72.** The provisions of ORPC Rule 8.4(d), 5 O.S. 2001, Ch.1, App. 3–A, state:

It is professional misconduct for a lawyer to:

\* \* \* \* \*

(d) engage in conduct that is prejudicial to the administration of justice;

**73.** Respondent also kept up the pretense at this hearing that Mayor Johnson had no interest in the water companies. Respondent's statement to the Commission was as follows:

"MR. DOBBS: Your Honor, I am the owner of River Oaks and Eagle Bluff Water Systems. In approximately late July of this year, I entered into a purchase agreement with the City of Eufaula whereby they took over these two systems from me. The reason for it is that we were unable to adequately operate the systems on the available income at the time. We felt that the City of Eufaula, since we were purchasing water from the city to provide for the system, it would be more appropriate for them to own the system. Mayor Joe Johnson and his Council at that time decided that it would be prudent business to purchase the system from me and we did that . . . . ''

violation of ORPC Rule 8.4(d).[74] Respondent's conduct interfered with the Commission's ability to oversee the transfer of a utility under its jurisdiction by misleading the Commission in connection with administrative proceedings.

## VI

## COUNTS 15–16: THE MEGASTAR ENTERTAINMENT CENTER

¶ 101 Sometime in 1991, a promoter named Sam Medley ("Medley") proposed to the Eufaula City Council, the Eufaula Industrial Finance Authority (EIFA), and potential financial backers in Eufaula that the City could become the next Branson or Nashville if the community would invest with him in the construction of an entertainment complex. Medley was apparently convincing and on 13 January 1994, the EIFA issued $5,000,000.00 in revenue bonds to finance the construction costs of the project, which came to be known as MegaStar. Part of the arrangement for the bonds called for the EIFA to borrow $1,000,000.00 from the Oklahoma Industrial Finance Authority and to guarantee repayment of the borrowed funds with letters of credit. Those individuals who helped obtain the letters of credit were promised a fee in return for their assistance. One such letter of credit was obtained from respondent's mother in the amount of $150,000.00, in exchange for which she was to receive a fee of $20,000.00.

¶ 102 Respondent provided legal services to corporations owned by Medley in connection with the MegaStar project. On 30 May 1994, he submitted to Medley a statement for legal services rendered over a period of seven months in the amount of $20,000.00. Medley paid him out of bond funds. The statement failed to provide any details of the services rendered. Respondent was in practice at the time with another lawyer but did not place any of the $20,000.00 he received from Medley into their law practice account. Instead, he turned the check over to his mother, who thereby received the exact amount she was promised in exchange for her letter of credit.

## Count 15

¶ 103 The Bar accuses respondent in Count 15 of the Complaint of misusing his trust account to facilitate the MegaStar project, but no evidence was presented on this count at the PRT hearing. In the absence of any evidence, we exonerate respondent of this violation.

## Count 16

¶ 104 The Bar alleges in Count 16 of the Complaint that respondent violated ORPC Rule 8.4(c) and RGDP Rule 5.2 by submitting a fraudulent invoice for legal fees and then falsely testifying in his Bar deposition that the invoice was a legitimate statement for legal services rendered. The Bar alleges that the $20,000.00 respondent obtained from Medley was not in fact for legal services rendered on the MegaStar project, but was instead a smokescreen for the payment of the letter-of-credit fee to respondent's mother. The trial panel found that the Bar failed to prove either allegation by clear and convincing evidence. We agree.

¶ 105 The fact that respondent's invoice was for the precise amount promised to his mother and the fact that he turned the money over to his mother are not sufficient to prove that the invoice itself was fraudulent. Testimony from two other attorneys who worked with respondent on the MegaStar project established that respondent provided sufficient legal services to more than justify a fee in the amount respondent received. Respondent's law partner at the time testified at the PRT hearing that he was not aggrieved by respondent's failure to put the money into their law office account and provided a justification for respondent's handling of the fee outside of their partnership. We find the evidence insufficient to prove that respondent's invoice for legal fees was

74. That rule sanctions conduct that interferes with the administration of "judicial process." It covers only severe interference with judicial proceedings or conduct of such a severe nature that it harms our system of representative litigation as a whole. *State ex rel. Okla. Bar Ass'n v. Bourne,* 1994 OK 78, ¶¶ 8–9, 880 P.2d 360, 362–363; *State ex rel. Okla. Bar Ass'n v. Minter, supra* note 40 at ¶ 24, n. 55, at 774, n. 55.

fraudulent. We hence also find that he did not lie about the legitimacy of the invoice when he gave his Bar deposition. Respondent stands exonerated of the violations alleged in this count of the Complaint.

## VII

### MITIGATING CIRCUMSTANCES

¶ 106 Mitigating circumstances may be considered in assessing the appropriate quantum of discipline.[75] Respondent has raised eleven factors in mitigation. Those for which we find record support and which merit consideration are: (1) respondent's youth and inexperience when the majority of the misconduct occurred; (2) the length of time since the majority of the misconduct occurred; (3) respondent's termination of his relationship with Johnson and his cooperation with authorities in the Johnson criminal case; (4) the absence of a prior disciplinary record for respondent; (5) the fact that no grievances have been filed against respondent since those giving rise to this proceeding were brought; and (6) the fact that respondent is currently reputed to be a productive and respected member of the bankruptcy bar in his part of the state. We have also taken note of the fact that witnesses called by both parties to this proceeding testified favorably about respondent's character.

## VIII

### RESPONDENT'S MISCONDUCT WARRANTS A SUSPENSION OF HIS LICENSE TO PRACTICE LAW FOR TWO YEARS AND ONE DAY AND HE IS DIRECTED TO PAY THE COSTS OF THIS PROCEEDING

¶ 107 We now turn to the appropriate sanction. The Bar contends that the appropriate discipline for respondent's misconduct is a suspension from the practice of law for thirty (30) months. Respondent urges that we visit upon him a private reprimand.

¶ 108 A license to practice law is conferred not for the benefit of the individual licensee, but rather for that of the public.[76] The disciplinary process, including the imposition of a sanction, is designed not to punish the delinquent lawyer, but to safeguard the interests of the public, the judiciary, and the legal profession.[77] Disciplinary sanctions serve not only to deter the offending lawyer from committing similar acts in the future, but also operate to put others on notice that departures from ethical norms will not be tolerated.[78] The disciplinary measure imposed upon an offending lawyer should be consistent with the discipline imposed upon other practitioners for similar acts of professional misconduct.[79]

¶ 109 If the gravity of respondent's professional misconduct were to be determined solely by the number of rules broken, respondent's misconduct would indeed call for a severe measure of discipline. We have found that he committed over two dozen separate rule violations. Yet it is the nature of these offenses, not their number, that concerns us here. They cast doubt upon respondent's honesty and integrity. In short, they raise grave doubts about respondent's ethical fitness to practice law.

¶ 110 This is not, as respondent would have us believe, a case limited to a few ethical lapses early in respondent's career. Respondent admits that he engaged in unprofessional conduct only in the Cargile matter and even today acknowledges only some of the ethical lapses he committed in that affair. Even if we were to agree with respondent's

**75.** *State ex rel. Okla. Bar Ass'n v. Minter, supra* note 40 at ¶ 48, at 780; *State ex rel. Okla. Bar Ass'n v. Taylor,* 2000 OK 35, ¶ 33, 4 P.3d 1242, 1255.

**76.** *State ex rel. Okla. Bar Ass'n v. Giger, supra* note 5 at ¶ 18, at 863-4.

**77.** *State ex rel. Okla. Bar Ass'n v. Smith,* 1980 OK 126, ¶ 21, 615 P.2d 1014, 1018; *State ex rel.* *Okla. Bar Ass'n v. Lowe,* 1982 OK 20, ¶ 19, 640 P.2d 1361, 1363.

**78.** *State ex rel. Okla. Bar Ass'n v. Cummings,* 1993 OK 127, ¶ 29, 863 P.2d 1164, 1174; *State ex rel. Okla. Bar Ass'n v. Hall,* 1977 OK 117, ¶ 12, 567 P.2d 975, 978.

**79.** *Giger, supra* note 5.

self-assessment of his professional misconduct in the Cargile matter, we would not accede to respondent's proposed measure of discipline. The gravity of those early offenses merits a greater quantum of discipline than respondent urges. He engaged in deceitful practices that had serious adverse consequences for his client. We have previously held that there is no equitable statute of limitations in bar disciplinary proceedings.[80] This Court does not take lightly charges against a member of the Bar regardless of when they occurred.

¶ 111 Honesty and integrity are the cornerstone of the legal profession. Nothing reflects more negatively upon the profession than deceit.[81] In imposing discipline, the court evaluates the entire record of an attorney's professional conduct and scrutinizes the record to determine whether the alleged offenses are a mere blotch on an otherwise untainted career, or just one long series of ethically questionable actions.[82] We are here confronted with an ongoing pattern of deceitful practices having adverse consequences for others. In the first lawsuit he ever brought as an attorney, respondent filed in a district court suit a false and misleading affidavit. Two years later in the same case, he falsely notarized a filed affidavit. He instructed a member of his office staff to place a false jurat on a document. He failed to tell the truth in the Cargile deposition. He failed to tell the truth in the evidentiary hearing held in the Johnson criminal trial. He failed to tell the truth to the Oklahoma Corporation Commission. He failed to tell the truth to the Eufaula City Council. He failed to tell the truth in his Bar deposition. Finally and most tellingly, his testimony to the trial panel in this proceeding demonstrates that he has yet to recognize and concede the numerous times he has failed to tell the truth.

¶ 112 A lawyer's misconduct adversely reflects on the entire Bar. It exhibits a lack of commitment to clients, to the courts, and to other members of the Bar.[83] The serious nature of the misconduct shown by this record damages the whole profession's image as a licensed community of practitioners worthy of public trust.[84] Respondent's frequent use of deceit and his apparent inability to recognize this destructive pattern of behavior demand a disciplinary measure that will force him to confront the entirety of his misconduct, truly protect the public, and maintain public confidence in the Bar. A suspension from the practice of law for two years and one day is a necessary and appropriate sanction for respondent's unprofessional conduct.

¶ 113 The Bar has filed an application to assess the costs of this proceeding against respondent in the amount of $13,963.34. Respondent objects to the amount the Bar seeks, asserting that some of the claimed costs are not reasonable or necessary and that others are attributable to allegations which did not result in discipline. The court today determines that respondent committed one or more of the violations alleged in ten of the fifteen counts actively pursued by the Bar. We have exonerated respondent of violating five of the pressed counts. We therefore direct respondent to pay the proportionate costs of this proceeding attributable to the ten counts proved by the Bar in the amount of $9,308.89.[85]

## IX

### SUMMARY

¶ 114 The record in this proceeding provides clear and convincing evidence that respondent engaged in numerous acts of misconduct in violation of the rules governing professional ethics. He failed competently to represent a client to that client's detriment,

80. *State ex rel. Okla. Bar Ass'n v. Warzyn,* 1981 OK 23, ¶ 24, 624 P.2d 1068,1071.

81. *See e.g. Flint's Case,* 133 N.H. 685, 582 A.2d 291, 293 (1990).

82. *Id.*

83. *State ex rel. Okla. Bar Ass'n v. Evans,* 1994 OK 45, ¶ 17, 880 P.2d 333, 338.

84. *See State ex rel. Okla. Bar Ass'n v. Colston,* 1989 OK 74, ¶ 23, 777 P.2d 920, 926.

85. The sum of $9,308.89 represents two/thirds of the amount sought by the Bar in its application.

he dealt unethically with an unrepresented person, and he engaged in numerous acts of dishonesty over a considerable period of time. By his testimony and argument in this proceeding, he has demonstrated that he still does not recognize the full extent of his ethical lapses. Respondent needs time to reassess his professional life. A suspension for two years and one day will afford him that opportunity while protecting the public and the profession from this licensed practitioner's further acts of misconduct.

¶ 115 **RESPONDENT IS SUSPENDED FROM THE PRACTICE OF LAW FOR TWO YEARS AND ONE DAY, THE SUSPENSION TO BEGIN ON THE DAY THIS OPINION BECOMES FINAL, AND HE IS DIRECTED TO PAY THE COSTS OF THIS PROCEEDING IN THE AMOUNT OF $9,308.89, WHICH SHALL BE DUE NOT LATER THAN NINETY (90) DAYS AFTER THIS OPINION BECOMES FINAL.**

¶ 116 OPALA, V.C.J. and LAVENDER, HARGRAVE, WINCHESTER and EDMONDSON, JJ., concur.

¶ 117 HODGES and KAUGER, JJ., concur in result.

¶ 118 WATT, C.J., dissents.

¶ 119 BOUDREAU, J., not participating.